1  Joe R. Abramson, Esq. (SBN 105241)
   A. Scott Brown, Esq. (SBN 221786)
2  Abramson & Brown
   21700 Oxnard Street, Suite 430
3  Woodland Hills, California 91367
   Telephone: (818) 227-6690
4  Facsimile:  (818) 227-6699
   email: asblaw@pacbell.net
5  email: jralaw1@pacbell.net

6  Keith S. Dobbins, Esq. (SBN 100589)
   Law Offices of Keith S. Dobbins
7  21700 Oxnard Street, Suite 1290
   Woodland Hills, California 91367
8  Telephone: (818) 348-3442
   Facsimile:  (818) 348-6168
9  email: kdobbinslaw@aol.com

10 Attorneys for Plaintiffs
   Jin L. Wang and Hong L. Tan
11

12                  **UNITED STATES BANKRUPTCY COURT**
13
                     **CENTRAL DISTRICT OF CALIFORNIA**
14
                    **SAN FERNANDO VALLEY DIVISION**
15

16 In re                                )    Case No.  1:09-bk-25448-KT
                                         )
17 KEVIN M. HEISSER AND                  )    Chapter 7
   LISA M. HEISSER,                      )
18                                       )    Adv.  No. 1:10-ap-01061-KT
                Debtors.                 )
19 _____       )    **FIRST AMENDED**
                                         )    **COMPLAINT TO DETERMINE**
20 JIN L. WANG AND HONG L. TAN,          )    **DISCHARGEABILITY OF DEBT**
                                         )    **PURSUANT TO 11 U.S.C.**
21              Plaintiffs,              )    **§523(c)(1);  §523(a)(2)(A); AND**
                                         )    **§523(a)(4)**
22 v.                                    )
                                         )
23 KEVIN M. HEISSER,                     )
                                         )
24                                       )
                Defendant.               )
25 _____       )

26        Plaintiffs, Jin L. Wang and Hong L. Tan (collectively **"Plaintiffs"**), submits this

27 complaint for a determination of the dischargeability of debt owed to Plaintiffs by the debtor

28 and defendant Kevin M. Heisser, (the **"Debtor"** or **"Defendant"**), (Plaintiffs and the

7.      Plaintiffs allege on information and belief that Hamercop Homes, Inc. ("Hamercop") is a California Corporation, with its principal place of business located at 3033 Rikkard Drive, Thousand Oaks, California 91362. Plaintiffs are further informed and believe and thereon allege that Hamercop was acting as a licensed California general contractor holding the license classification B, and operating under California contractor's license number 791562.

8.      Plaintiffs allege on information and belief that Christopher Heisser (hereafter "Christopher") is an individual and a resident of the State of California.

9.      Plaintiffs allege on information and belief that Peter Heisser (hereafter "Peter") is an individual and a resident of the State of California.

10.      Plaintiffs allege on information and belief that Christopher is the brother of Defendant and that Peter is the father of Defendant and Christopher.

11.      Plaintiffs allege on information and belief that Christopher and Peter were the principals of an entity known as Camdyne Corp. (hereafter "Camdyne") a California Corporation. Camdyne was for a period of time a licensed California general contractor holding the license classification B, and operating under California contractor's license number 663767.

12.      Plaintiffs allege on information and belief that in or around the same that Christopher was a principal of Camdyne, he was also doing business as a contractor under the fictitious business name of CHHQ Company (hereafter "CHHQ"). CHHQ was, for a period of time, a licensed California general contractor holding the license classification B, and operating under California contractor's license number 744376.

13.      Plaintiffs are informed and believe and thereon allege that Kevin previously worked for CHHQ as a responsible managing employee of the business.

A.      The Conspiracy To Defraud.

14.      Plaintiffs allege on information and belief that in or around 1999, the California Contractors' State Licensing Board ("CSLB") revoked Camdyne's license due to its findings that Camdyne committed numerous and serious violations of the California

- 3 -

Case 1:10-ap-01061-KT   Doc 11   Filed 06/15/10   Entered 06/15/10 12:50:32   Desc
Main Document      Page 3 of 53

1  Business and Professions Code and the CSLB'S regulations governing contractors. As
2  a result of the revocation of Camdyne's License, both Christopher and Peter were
3  prohibited from holding a contractor's license, acting as a licensed contractor and/or being
4  associated with any other licensed contractor, within the State of California.

5      15.    Plaintiffs allege on information and belief that in or around May 16, 2000, the
6  **CSLB** revoked CHHQ'S license due to its findings that CHHQ committed numerous and
7  serious violations of the California Business and Professions Code and the CSLB'S
8  regulations governing contractors.  As a result of the revocation of CHHQ'S License,
9  Christopher was prohibited from holding a contractor's license, acting as a licensed
10  contractor and/or being associated with any other licensed contractor, within the State of
11  California.

12     16.    Plaintiffs allege on information and belief that as a result of the suspensions
13  of Camdyne's and CHHQ'S licenses, in or around 2000, the Defendant, his brother
14  Christopher and their father Peter conspired and agreed amongst themselves that
15  Defendant would apply for and obtain a contractor's license with the CSLB, form a
16  corporation, and loan that license and corporation to Christopher and Peter so as to allow
17  them to continue to surreptitiously and illegally operate as purported licensed contractors'
18  in the State of California.

19     17.    Plaintiffs allege on information and belief that at the time Defendant agreed
20  to this arrangement, he knew that Christopher and Peter were prohibited by the CSLB
21  from obtaining a contractor's license and/or being associated with another license due to
22  past violations and infractions and could not themselves, either directly or indirectly act as
23  a general contractor in California.

24     18.    Plaintiffs allege on information and belief that, in furtherance of the stated
25  conspiracy alleged herein, Defendant obtained a California Contractor's License and
26  formed Hamercop.  Defendant thereafter transferred his license to Hamercop and
27  thereafter allowed Christopher and Peter to use Hamercop and its license to act as
28

- 4 -

1  California contractors and solicit business in the State of California from unsuspecting

2  homeowners, including the Plaintiffs. Plaintiffs further allege on information and belief that,

3  at all times material hereto, Defendant actively participated in the business and affairs of

4  Hamercop, including, but not limited to, financial affairs of the corporation, and received

5  financial payment and benefit from Hamercop.

6      19.    Plaintiffs allege on information and belief that Defendant and Christopher

7  knowingly and intentionally conspired together in various combinations, and agreed

8  amongst themselves to act in concert and in furtherance of a common scheme, plan and

9  design to commit, aid, abet and/or render substantial assistance in the wrongs complained

10 of herein, all designed to defraud unsuspecting members of the public, including the

11 Plaintiffs.   Plaintiffs are further informed and believe, and based upon such information

12 and belief allege that Defendant and his brother Christopher knew that when Christopher

13 directly and/or through Hamercop, represented himself and Hamercop as a licensed

14 general contractor, they were perpetrating a fraud on the general public, and later upon the

15 Plaintiffs.   The Defendant knowingly and intentionally facilitated and assisted his co-

16 conspirators in the accomplishment of the fraud and wrongdoing, and had the right and

17 ability to control the actions of the Christopher and Hamercop, but did nothing to curb the

18 activities described herein, or prevent others from engaging in such conduct. Plaintiffs are

19 further informed and believe, and based upon such information and belief allege, that

20 Defendant and Christopher, and each of them, actively condoned, encouraged,

21 participated in, and/or instigated the conduct described below in furtherance of their

22 common scheme, plan, conspiracy and design which entailed, among other things: (a)

23 aiding and abetting the conspiracy and common course of conduct complained of herein;

24 (b) participating in and/or knowing and acquiescing in the acts complained of herein,

25 sufficient to categorize such conduct as conspiratorial;  and ©) taking and/or ratifying

26 conduct to enrich themselves or their co-conspirators, at the expense of Plaintiffs (the

27 foregoing is hereafter referred to as the **"Fraudulent Conspiracy"**). Defendant knowingly

28 and intentionally actively condoned, encouraged, participated in, and/or instigated the

- 5 -

1  conduct described below in furtherance of their common scheme, plan, conspiracy and

2  include, but is not limited to the following:

3      1.      Department of Consumer Affairs Contractors State Licensing Board

4              Licensee Investigation Report (**"CSLB Report"**) in which the investigator

5              cites several admissions by Defendant that he was actively involved in the

6              operations of Hamercop during the time relevant to the instant case, that

7              Christopher was representing himself as an officer of Hamercop, and that

8              Christopher was soliciting business and providing bids to unsuspecting

9              homeowners. A true and correct copy of the CSLB Report is attached hereto

10             marked Exhibit "1" and incorporated herein by this reference;

11     2.      Check dated February 24, 2005, from Hamercop to Defendant (**"the

12             February 24, 2005 Check"**). A true and correct copy of the February 24,

13             2005 Check is attached hereto marked Exhibit "2" and incorporated herein

14             by this reference; and

15     3.      Statement of Information dated December 11, 2008 (**"the 2008 Statement

16             of Information"**), for Hamercop identifying Christopher and Defendant as the

17             officers of the Hamercop. A true and correct copy of the 2008 Statement of

18             Information is attached hereto marked Exhibit "3" and incorporated herein by

19             this reference.

20         20.    The Plaintiffs are informed and believe and thereon allege that there exists,

21  and at all pertinent times existed, a unity of interest and ownership between Hamercop,

22  the one hand, and Defendant, Christopher, and Peter, on the other hand, such that any

23  individuality and separateness between those parties have ceased. Plaintiffs are further

24  informed and believe and thereon allege that Hamercop, on the one hand, and Defendant,

25  Christopher, and Peter, on the other hand, are the alter ego of each other for the following

26  reasons:

27             (a)     Plaintiffs are informed and believe and thereon allege that at all times

28

- 6 -

1   relevant, Hamercop was so inadequately capitalized that, compared with the business to

2   be done by Hamercop and with the risks attendant thereon, that its capitalization was

3   trifling; and/or

4        (b)    Plaintiffs are informed and believe and thereon allege that Defendant,

5   Christopher, and Peter utilized the assets of Hamercop for their own use, caused assets

6   of Hamercop to be transferred to them without adequate consideration, and withdrew funds

7   from the bank accounts held in the name of Hamercop for their own use without adequate

8   consideration; and/or

9        (c)    Plaintiffs are informed and believe and thereon allege that Hamercop

10  was a mere shell, instrumentality, and conduit through which Defendant, Christopher, and

11  Peter carried on their personal business; Defendant, Christopher, and Peter exercised

12  complete control of the business to such an extent that any individuality or separateness

13  of Hamercop does not, and at all times mentioned herein, did not, exist; and/or

14       (d)    Plaintiffs are informed and believe and thereon allege that the

15  corporate formalities recognizing the separateness of Hamercop as an entity separate and

16  apart from Defendant, Christopher, and Peter were not observed, including, but not limited

17  to, any or all of the following: (1) the failure to conduct meetings of the Board of Directors

18  or Shareholders, (2) the failure to maintain corporate minutes of the decisions of the Board

19  of Directors, and/or (3) the failure to issue stock, and (4) the failure to elect officers and

20  directors.

21       21.    The Plaintiffs are informed and believe and thereon allege that adherence

22  to the fiction of the separate existence of Hamercop as an entity separate and distinct from

23  Defendant, Christopher, and Peter, would sanction a fraud on the creditors of Hamercop

24  for the reasons set forth above and below, all for the purpose of avoiding and preventing

25  attachment and execution by creditors, including Plaintiffs, and thereby rendering

26  Hamercop unable to meet its financial obligations.

27  **B.    The Fraud Perpetrated Against Plaintiffs.**

28       22.    In or around April 2005, the Plaintiffs were interested in hiring a contractor

- 7 -

1    to complete the total landscape, hard scape, and swimming pool (the **"Work"**) for their

2    recently purchased home located at 11243 Watson Drive, Moorpark, CA 93021 (the

3    **"Property"**).    After contacting several other contractors, the Plaintiffs approached

4    Christopher, who was doing work on a neighbor's home, and had placed a sign on the that

5    property. After some preliminary discussions, Christopher agreed to prepare and to submit

6    a proposal for the Work for Plaintiffs' consideration.    During the Plaintiffs' initial

7    conversations with Christopher at the Property, he made the following representations to

8    Plaintiffs -

9           (a)    that he, Christopher was personally licensed as a California General

10                 Contractors and in good standing and with a clean record with the

11                 CSLB;

12          (b)    that Hamercop was a licensed California General Contractor in good

13                 standing and with a clean record with the CSLB;

14          (c)    that he, Christopher, had been a licensed contractor in the State of

15                 California for many years with extensive experience in remodeling

16                 homes and the remodeling and construction of swimming pools;

17          (d)    that Hamercop had a sufficient work force to complete the Work

18                 within the time frame discussed and promised;

19          (e)    that Hamercop was bonded and fully insured;

20          (f)    that he, Christopher, would be personally on the job site at all times;

21          (g)    that he, Christopher, was experienced, qualified and properly licensed

22                 to perform all of the Work;

23          (h)    that he, Christopher, would ensure that the Work was consistent with

24                 industry standards, would comply with any and all building codes, and

25                 would be approved by all required governmental agencies;

26          (i)    that the total contract price would include all labor and materials

27                 necessary to complete the Work in a timely manner; and

28

1         (j)    other representations according to proof.

2     23.    The Plaintiffs allege that at the time that Christopher made the foregoing

3 representations, he was acting as the authorized agent of the Defendant, in furtherance

4 of the Fraudulent Conspiracy, with the full knowledge and consent of Defendant, and as

5 such, those representations and actions are imputed to the Defendant.

6     24.    The Plaintiffs are informed and believe and thereon allege that as of the date

7 that the representations identified in the preceding paragraph were made, the

8 representations were false and that Christopher knew the representations were false. The

9 Plaintiffs are further informed and believe and thereon allege that as of the time that the

10 representations identified in the preceding paragraph were made, Christopher had no

11 intention, and no ability, of performing the acts in the manner promised.

12     25.    The Plaintiffs were unaware of the falsity of the foregoing representations

13 identified herein and believed them to be true at the time the representations were made.

14     26.    Because of the Plaintiffs' trust in Christopher, Hamercop, and their lack of

15 sophistication in such matters, in reasonable reliance on the foregoing representations,

16 including the fact that Christopher and Hamercop were duly licensed and qualified as a

17 general contractor with the State of California, the Plaintiffs agreed to hire Hamercop as

18 the general contractor to perform the work on the Property.

19     27.    Based on the representations identified herein, the Plaintiffs decided to hire

20 Hamercop and in April of 2005, Christopher went to the Plaintiffs' residence and presented

21 them with a contract entitled, "Construction Agreement" which was then signed by them

22 as the "Owners" and by Christopher as the purported President of Hamercop . A true and

23 correct copy of the Contract is attached hereto, marked Exhibit "4" and incorporated herein

24 by this reference (the **"Contract"**).

25     28.    Thereafter, work commenced on the Property as called for under the

26 Contract (the **"Project"**).

27     29.    Over the course of the following ten (10) months, Christopher repeatedly

28 made oral demands for monies, and in most instances, provided the Plaintiffs with little if

1   any written documentation supporting the amounts he was demanding.  In those instances

2   where paper work was provided, the paper work was often times confusing and

3   unintelligible.

4      30.    As the Project progressed, the Plaintiffs became increasingly concerned as

5   the monies they were paying was fast reaching the total amount of the Contract but the

6   Project was nowhere near completion.

7      31.    The Plaintiffs are informed and believe and thereon allege that, although the

8   Contract specifies that the contractor on the project would be Hamercop, in reality, the

9   Defendant was merely "loaning" Hamercop's contractor license to Christopher, and that he,

10  Christopher, was the actual contractor on the Project.  The Plaintiffs are informed and

11  believe and thereon allege that the work pursuant to the Contract required that Christopher

12  have a valid California contractor's license.

13     32.    During the course of the Project, the Plaintiffs paid Christopher and/or

14  Hamercop approximately One Hundred Thirty-Eight Thousand Three Hundred

15  Eighty-Three Dollars ($138,383.00), despite the fact that the Project was never completed

16  and what work was done, was not completed in a workman-like manner.

17     33.    As a direct and proximate result of the aforementioned acts, conduct and

18  failures to act, and the false representations,  Plaintiffs have suffered and continue to

19  suffer, damages exceeding the sum of Two Hundred and Fifty Thousand Dollars the nature

20  of which include, but not limited to the following -

21         (a)    costs incurred in completing the required scope of work, in an amount

22  according to proof;

23         (b)    costs incurred in repairing the defective work, in an amount according

24  to proof;

25         ©)    costs incurred to remove non-conforming materials and replacing the

26  materials with materials conforming to the requirements of the Contract, in an amount

27  according to proof;

28

1          (d)    damages caused to the structure of the residence as a result of

2 improper drainage and the covering of the weep screed;

3          (e)    fines imposed by the Plaintiffs' Homeowner's Association due to the

4 improper construction of the drainage line;

5          (f)    diminution in value of the Property;

6          (g)    damages incurred due to delay in completion of the Project including

7 costs associated with finding temporary housing in an amount according to proof; and

8          (h)    other damages according to proof.

9     34.    Plaintiffs allege on information and belief that these acts by Defendant, and

10 those attributed to him by reason of the Fraudulent Conspiracy, were malicious, despicable

11 and/or fraudulent conduct that subjected the Plaintiffs to a cruel and unjust hardship in

12 conscious disregarding of their rights and justifies an award of exemplary and punitive

13 damages.

14     35.    California Business and Professions Code, §7160 provides for the recovery

15 of a penalty in the amount of Five Hundred Dollars ($500.00) plus attorneys' fees for a

16 contractor's false or fraudulent representations or false statements.

17     36.    Since the Contract involved the construction of a swimming pool, Plaintiffs

18 are entitled to the recovery of their reasonable attorney's fees under California Business

19 and Professions Code, §7168.

20     37.    The Plaintiffs, Defendant, Christopher and Hamercop attempted to resolve

21 this matter prior to proceeding with litigation. In order to have sufficient time in which to try

22 to settle the matter through mediation, the parties executed two tolling agreements in order

23 to toll the running of any and all statutes of limitations. A true and correct copy of the first

24 tolling agreement is attached hereto marked Exhibit "5" and incorporated herein by this

25 reference. A true and correct copy of the second tolling agreement is attached hereto

26 marked Exhibit "6" and incorporated herein by this reference. The legal effect of the tolling

27 agreements were to stay the accrual of any applicable statute of limitations affecting

28 Plaintiffs' claims, including any claim based upon fraud, through and including March 1,

1   2009.  When settlement failed, on or about May 23, 2009, Plaintiffs commenced an action

2   before the Superior Court of the State of California, County of Ventura, assigned Case

3   No.56-2009-00345281-CU-BC, naming the Defendant, Hamercop and Christopher as

4   defendants ("**the State Court Action**").  The State Court Action was timely and within the

5   applicable statute of limitations period applicable to such claims.    Hamercop and

6   Christopher defaulted by failing to file a timely response to the Summons and Complaint.

7   That action was stayed by reason of Defendant's filing for relief under chapter 7 before this

8   Court.

9   **FIRST CLAIM FOR RELIEF**

10  **[For Determination of Non-Dischargeability Of Debt
    As Against Defendant Pursuant to 11 U.S.C. §523(a)(2)(A)]**

12  38.    Plaintiffs incorporate by this reference the allegations in paragraphs 1 through

    31, inclusive, as though fully set forth in this first claim for relief.

13  39.    The foregoing actions and conduct of the Defendants constitute false

14  pretenses, false representations and actual fraud.

16  40.    In addition to Plaintiffs' general damages, the acts and conduct of Defendant

17  were willful and malicious, designed and intended to cause harm to Plaintiffs, and thereby

18  causing harm and damage to the Plaintiffs.  As a result, Plaintiffs are entitled to an award

19  of punitive and exemplary damages in an amount according to proof at the time of trial.

20  41.    As a result of Defendants' false pretense, false representations, and/or

21  fraud, Plaintiffs are entitled to a determination that the debt owed to Plaintiff totaling at

22  least $250,000.00, together with accrued interest, attorney's fees, costs and punitive

23  damages, is exempt from the discharge pursuant to the provisions of 11 U.S.C.

    §523(a)(2)(A).

24  ///

25  ///

26  ///

27  ///

28

## SECOND CLAIM FOR RELIEF

### [For Determination of Non-Dischargeability Of Debt
### As Against Defendant Pursuant to 11 U.S.C. §523(a)(4)]

42. Plaintiffs incorporate by this reference the allegations in paragraphs 1 through 31, inclusive, as though fully set forth in this second claim for relief.

43. By reason of the Fraudulent Conspiracy, the acts and conduct of Hamercop and Christopher are imputed to Defendant, which acts and conduct constitute embezzlement of property of Plaintiffs.

44. By reason of the embezzlement by Defendant, Plaintiffs are entitled to a determination that the debt owed to Plaintiff totaling at least $250,000.00, together with accrued interest, attorney's fees, costs and punitive damages, is exempt from the discharge pursuant to the provisions of 11 U.S.C. §523(a)(4).

**WHEREFORE**, Plaintiffs pray that judgment be entered as follows -

1. That Defendant's obligation to Plaintiffs be declared nondischargeable pursuant to 11 U.S.C. §523(a)(2)(A) and that a nondischargeable judgment be entered for said relief in an amount according to proof at the time of trial;

2. That Defendants' obligations to Plaintiffs be declared nondischargeable pursuant to 11 U.S.C. §523(a)(4) and that a nondischargeable judgment be entered for said relief in an amount according to proof at the time of trial;

3. For Plaintiff's cost of suit;

4. For all attorney's fees incurred and to be incurred by Plaintiff; and

5. For such other and further relief as this Court deems just and appropriate.


Dated: May 26, 2010                          ABRAMSON & BROWN



                                   By: _____/s/_____
                                        A. Scott Brown
                                        Attorneys for Plaintiffs
                                        Jin L. Wang and Hong L. Tan

DEPARTMENT OF CONSUMER AFFAIRS
CONTRACTORS STATE LICENSE BOARD
**Licensee Investigation Report**

License No.: 791562
Classification: B - General Building
Complaint No.: NA 2006-2132

Date Received:
Date Assigned: 12-6-2006
Assigned to: A. Widmeyer

| Complainant or Informant | Address | Phone |
|---|---|---|
| Mrs. Ning-Tian Zhang | 6958 Hogan St.<br>Moorpark, CA 93021 | 805-529-5539, 805-252-2802<br>626-402-2284 |

| Name of Owner | Address | Phone |
|---|---|---|
| Mrs. Ning-Tian Zhang and<br>Mr. Gong-Jie Zhang | 6958 Hogan St.<br>Moorpark, CA 93021 | 805-529-5539, 805-252-2802<br>626-402-2284 |

| Type/Location of Project | Address | Phone |
|---|---|---|
| pool, landscaping and patio cover. | 6958 Hogan St.<br>Moorpark, CA 93021 | 805-529-5539, 805-252-2802 |

| Primary Respondent | Address of Record | Phone |
|---|---|---|
| Hamercop Homes, Inc. | 3033 Rikkard Dr.<br>Thousand Oaks, CA 91362 | Bus. 818-917-0738, 818-575-9955<br>Res. 310-479-2652 |

**Respondent's Attorney**
T. Randolph Catanese, Esq., 31416 W. Agoura Rd., Ste. 240, Westlake Village, CA 91361; 818-707-0407, fax 818-707-1161

| Respondent's Personnel | Date Stats Expire May 2010 |
|---|---|
| Kevin Matthew Heisser - RMO/CEO/Pres. | |

Other Entities:
1. Christopher Howard Heisser is revoked on his former sole ownership license 744376 and corporate license 663767 of "The Camdyne Corp." where he was RMO/CEO/Pres.

Sections Violated: 7083, 7107, 7108.5, 7109(a), 7112, 7113, 7114, 7117(b), 7121.5, 7159(d)(8)(C) and (d)(9)(C)        **Dates of Occurrence** 1-10-2005 through 2-20-2006

Related Sections: 7090, 7090.1, 7097, 7098. Kevin Heisser subject to 7121, 7121.5, 7122.1 and 7122.5. Formerly Revoked Officer left off of CSLB records Christopher Heisser subject to 7121, 7121.1 and 7122.

## SUMMARY OF INVESTIGATION:

    Christopher Howard Heisser's sole ownership license for "CHHQ Company" #744376 and corporate license for "The Camdyne Corp." #663767 were previously revoked on 5-16-2000 (Exhibit 2). under the provisions of 7090.1 for failure to comply w/ if 290 258e

    Subsequently on 2-21-2001 respondent Kevin Matthew Heisser, brother of Christopher, obtained subject license #791562 as it's sole corporate officer and failed to list in his application and subsequent renewals his revoked brother Christopher who is the CEO of "Hamercop Homes, Inc." as shown on Secretary of State records (7112, 7117(b), 7083; Exhibit's 1 and 3). Kevin Heisser is employed at Discovery Mortgage and has little to do with construction activities of respondent corporation "Hamercop Homes, Inc. The construction activities are almost entirely managed by his revoked brother Christopher, aka: "Chris". Kevin Heisser employed, elected and/or associated with his revoked brother Christopher Heisser who essentially ran the construction business of "Hamercop Homes, Inc." (7114 and 7121.5).

    On 1-10-2005, "Chris" Heisser as President of "Hamercop Homes. Inc." entered into a $108,735.00 written home improvement contract with Mr. and Mrs. Zhang to provide all materials and perform all work shown on plans and Scope of Work attached to it as Exhibit B (Exhibit's 4 and 5) and paid the $5,000 down payment as requested and specified in the contract (7159 ;Exhibit's 3 and 6). Work included building a swimming pool and spa, hardscape, patio cover,

EXHIBIT "1"

and landscaping the fror~ ~~~ yards. Respondent was only ~~~ neral building classification on license.

Work began approximately 3-8-2005 after the second payment of $10,000, and stopped approximately 2-20-2006. Respondent invoices dated 4-20-2005 and 5-10-2005 respectively specified $10,000 and $5,000 "due towards extra costs" without any further description. Mrs. Zhang paid these costs without knowing what they were for, but when her husband found out he requested she find out exactly what these costs were for. Mrs. Zhang made one more payment before details of the extras were received. Mrs. Zhang received details of the claimed extras after 6-30-2005. Most of the claimed extras had already been performed, the waterfall extra not done was cancelled and other extras were/are still incomplete. Mrs. Zhang continued efforts to get "Chris" Heisser to complete work, but had paid Respondent more than the value of work performed (7159). Vague description of work in contract led to written agreement to install fountain in rear yard, and Mrs. Zhang getting Peter Heisser, father of Kevin and "Chris", to install additional plants. "Chris" Heisser refused to return and complete work unless he received additional payment in advance (7107).

Two written credits were given by "Chris" to Mrs. Zhang; $1,000 for referring two neighbors to Chris who worked on their homes - later developing problems, and $400 for trees planted which died.

The price of claimed extras, after adjustments between parties, total $20,676.77 bringing the total contract price to $129,411.77. Credits of $1,400 were given but not paid to the Zhang's. Mrs. Zhang had paid Respondent $132,131.77. Industry Expert cost to correct and complete is $29,465.00 (7107 and 7109). This leaves a financial injury to the Zhang's of $33,585.00 (7113).

The swimming pool subcontractor, Barrett Pools, Inc., remains unpaid in the amount of $6,375.92 (7108.5) bringing the total financial injury to $39,960.92.

There has been a bond claim on which payment has not yet been received by the Zhang's.

**Financial Injury $39,960.92**

---

**DISPOSITION:** L1A referred to accusation
Other complaints are pending which may also be referred to accusation.
**Investigation closed by:** _A. Widmayer_   **Date:** _5-15-2007_   **Reviewer:** _____

EXHIBIT "1"

# INVESTIGATION REPORT

## 1. CONTRACT INFORMATION

**OWNER:**          Mrs. Ning-Tian  Zhang and Mr. Gong-Jie Zhang

**CONTRACTOR:**     Hamercop Homes, Inc.

**DATE:**           1-10-2005 signed and down payment made (contract typed 1-8-2005)

**AMOUNT:**         $108,735.00

**LOCATION:**       6958 Hogan St., Moorpark, CA  93021

**AGREED WORK:**   Provide all materials and perform all work shown on plans.  Scope of work was attached to contract as exhibit "B".
*Note of Enforcement Representative Widmeyer:  Misleading and vague contract refers to "Architectural Plan" dated 1/24/04 which was never shown or given to Zhang's.  Final contract plan and prior plan are both dated 12/5/04; not including swimming pool plan which homeowner never received.*

**PAYMENT SCHEDULE:**
"1- $5,000.00 due at signing of contract.
2- $10,000.00 due when pool dug.
3- $10,000.00 when plumbing, steel, electrical complete in pool.
4- $15,000.00 due when gunite installed.
5- $10,000.00 due when drainage installed in yard.
6- $10,000.00 due when forming for concrete installed.
7- $10,000.00 due when walls built.
8- $20,000.00 due when concrete poured.
9- $20,000.00 due when patio cover and trellis installed.
10- $5,000.00 due when plaster complete, pool equip installed
11- $3,735.00 due at completion

**CONTRACT SIGNED BY:**   Chris Heisser, President Hamercop Homes, Inc. and Mrs. Ning-Tian Zhang homeowner.

(Exhibit 3)

**EXTRA CONTRACT INFORMATION:**
Date received:        approximately 4-6-2005
Description of work:  Invoice #4 - engineer & permit fees
Amount:               $1,139.77 (Exhibit 7)

Date received:        approximately 9-17-2005
Description of work:  9-14-05 Invoice, claims landscape allowance/budged exceeded.
Amount:               $1,182.00 (Exhibit 7)

1

# EXHIBIT "1"

Date received:          approximately 6-30-2005
Description of work:    See below.  There were subsequent adjustments to prices of items as per
                        invoice dated 9-14-2005 (Exhibit 7).
Document titled "Revised Extra Statement"

1. Additional concrete              $9,250.00
2. Waterfall - not done/cancelled
3. Pilasters                        $2,075.00      (see 9-14-2005 invoice)
4. Jacuzzi bench                    $1,860.00
5. Deck bench - not wanted
6. Addl. cost "three rivers stone"  $1,970.00
7. Front walls                      $1,550.00
8. Driveway ribbons and side areas                 (see Compl. Statement)
9. Caps for pilasters                              (see 9-14-2005 invoice)
10. Pool equip. wall                $1,650.00
        Adjusted Sub Total          $18,355.00

Respondent's extras billing was prepared and received **after** most of items had already been
performed and others started which were/are incomplete.  The waterfall is the only item on
which work had not yet started and it was cancelled by Homeowners.
Mrs. Zhang did not receive Respondent's other list's titled "Extra Costs to Date" or "Second
Revision Extra Statement" (Exhibit 13).

**Total of three extras listed above**      $20,676.77

Date received:          Shown on 6-22-05 Invoice/ and shown on 9-14-05 Invoice
Description of credit:  Waived/ and Discount for Ning.  This was a credit for Mrs. Zhang referring
                        two neighbors to Chris who he subsequently did work for.
Amount:                 Credit of $1,000.00 (Exhibit 7)

Date received:          9-7-2006
Description of credit:  Credit for partial purchase cost of trees to replace those which died.
Amount:                 Credit of $400.00 (Exhibit 8)

**Total Extras less Credits**          $19,276.77


## 2. PAYMENT INFORMATION

| Date: | Check No.: | Amount: | Paid to: | Purpose: |
|-------|-----------|---------|----------|----------|
| 1-10-2005 | 1061 | $5,000.00 | Hamercop Homes, Inc. | Initial payment |
| 3-6-2005 | 1082 | 10,000.00 | "          " | #2 payment |
| 3-14-2005 | 1085 | 10,000.00 | "          " | payment #3 |
| 4-6-2005 | 1091 | 16,139.77 | "          " | #4 payment |
| 5-1-2005 | 1102 | 40,000.00 | "          " | payment 5,6,7 & extra |
| 5-11-2005 | 1104 | 15,000.00 | "          " | payment #8 |
| 5-11-2005 | 1001 | 10,000.00 | "          " | payment #8 |
| 6-30-2005 | 1120 | 18,000.00 | "          " | payment 9 & extra |
| 9-17-2005 | 1137 | 7,992.00 | "          " | for payment #11 |

        **Total Paid $132,131.77**        (Exhibit 6)

2


# EXHIBIT "1"

The financial injury was calculated as follows:

| | |
|---|---|
| Paid to Respondent: | $132,131.77 |
| Credits | 1,400.00 |
| Industry Expert Report: | + 29,465.00 |
| Total Cost : | $162,996.77 |
| Less Contract Price: | - 129,411.77   ($108,735.00 + $20,676.77) |
| Sub Total | $ 33,585.00 |
| Unpaid Subcontractor | + 6,375.92 |
| **Financial Injury:** | $ 39,960.92 |

(Exhibit's 4, 6, 7, 8 and 17)

## 3. PERFORMANCE INFORMATION

**COMPLAINT FACTS:**

**(a)   Work began on:**   approximately 3-8-2005

**(b)   Work last performed on:**   approximately 2-20-2006

**(c)   Work that was abandoned:**
1. Failed to complete installation of two sheer descent water features at west side of pool.
2. Failed to complete plaster of pool and spa.
3. Failed to supply and install pool and spa equipment.
4. Failed to supply and install two pool lights.
5. Failed to grind stone to eliminate sharp edges and protrusions.
6. Failed to supply install and paint patio shade trellis/timbers.
7. Failed to pressure wash and seal new concrete areas.
8. Failed to install lights, supplied by Homeowner, and wiring and controls for pilaster lights.
9. Failed to remove form boards below cap on front yard wall and complete cultured stone veneer in that area.
10. Failed to supply and install caps on front walkway walls.
11. Failed to supply and install light in spa.
12. Failed to supply labor only to install water fountain, supplied by Homeowner, in rear yard.

**(d)   Work that deviates from Accepted Trade Standards:**
1. Failed to properly install mastic joint between stone pool coping and stone/concrete deck.
2. Failed to install handhold device, "finger rail of stone", where vertical distance above water exceeds 9 inches.
3. Failed to provide and install adequate irrigation to attain full coverage in lawn and planter areas and valve stations overextended with too many sprinkler heads.
4. Failed to correct splitting seams of precast columns supporting patio cover.
5. Failed to repair concrete crack, near an inside corner by grass.
6. Failed to use grout to match existing where steps were repaired in front yard.
7. Failed to clean off mortar splashed on garage door and house stucco, and remove mortar/cement on surface of driveway.

**(e)   Work that does not conform to the plans and/or specifications:**   None.

3

EXHIBIT "1"

## 4. STATEMENT OF WITNESSES

**(a)    Complainant:**

**1-12-2007** Enforcement Representative Widmeyer met with Mrs. Ning-Tian Zhang at her home the job site at 6958 Hogan St., Moorpark, CA. Mrs. Zhang's statements are summarized as follows:

My husband and I purchased a new home and had to have the front and back yard landscaped. It took us a while to save up enough money to have this work done. I first met Pete Heisser on 9-24-2003 when looking into having some landscaping done. At a subsequent meeting Pete came with his son Chris Heisser to go over landscaping I wanted done. Pete said he was getting too old to do the job and asked that I let his son Chris do the job. I called Chris back in Dec. 2004. I always thought that Chris was the owner. Chris gave me an estimate for $93,000 to install a pool and landscape the back yard only. Chris gave me three addresses to see in Thousand Oaks to see his landscaping. I went to see one of these. The lady answered the door and said she didn't know anything and that her husband handled everything. I was unable to even get her to confirm if Chris had done their landscaping.

I contacted Chris again to get a bid on landscaping both the front and back yard. Chris gave me a plan and estimate for $139,000 which we could not afford. This plan showed an irregular shaped fountain in the back yard (Exhibit 5).

Chris then came back with this subsequent plan which is what our contract was based on (Exhibit 5). The contract shows 1-8-2005, but the $108,735 contract was actually entered into on 1-10-2005 when we paid the $5,000 down payment (Exhibit's 4 and 6). The contract was to landscape our front and back yard, install a patio cover and pool as shown on the plan and as described in the scope of work. We entered into the contract with Chris here at our house. The contract plan shows two round water fountains. In our contract we agreed verbally to delete the front yard fountain, the gazebo with stepping stone path to it and reduce the size of the patio cover eliminating two patio support columns. This contract also verbally included moving the pool equipment from beside the house to the rear corner of the back yard. It was also agreed, from the very beginning of our discussions, to enlarge the driveway entrance. This shows on the prior plan but not on the subsequent contract plan (Exhibit 5).

Work started on 3-8-2005 two days after I made the second payment of $10,000 on 3-6-2005 (Exhibit 6). Chris said he needed the money to rent the equipment and bobcat to start work.

Cutting my driveway to install stone ribbons was not supposed to be done. Chris begged me to allow him to do it and said he would do it for free. I again insisted that I did not want him to cut our driveway to put in stone ribbons, even if it was free. Chris did this anyway and installed a bench on our back yard pool deck without our permission. We did not want this bench either. Chris later tried to charge us for doing this work which we did not want done.

I made payments as requested by Chris on his invoices (Exhibit's 6 and 7). There was no invoice #3 and some of the later invoices were not numbered. The $1,139.77 for engineering and permit costs on invoice #4 were extra costs. The next unnumbered invoice shows $10,000 extra costs with no explanation, I did not ask about this and just paid it on 5-1-2005. Chris only said there was extra work but did not tell me what it was. The next invoice #6 shows $5,000 extra costs with no explanation, I also paid this on 5-11-2005. My husband asked me to get an explanation of what the extra costs were, for which we had already paid $15,000. I asked Chris but he only said there was extra concrete.

The next unnumbered invoice showed $9,000 extras. Chris gave me a $1,000 discount on this invoice for two neighbors I had referred to him. These people also hired Chris and had

4

# EXHIBIT "1"

problems with Chris. I paid this invoice less the $1,000 discount on 6-30-2005. I paid the additional $9,000 for extras even though I still had received no explanation of what the extra charges were for. On this invoice the name Paul and phone numbers are written on it. Paul was the owner of "Precast by C.R. I." He offered me a $775 refund, which I did not receive, on the caps because he didn't want to give the money to Chris. He was paid $775 by Chris for caps that were never supplied (Exhibit 15).

At that point we had already paid Chris $124,139.77 (Exhibit 6). This was more than our contract price and we still didn't know what the extras were. The first description of extras we received after June 2005, even though Chris wrote 6-1-2005 on it. This was the first list of extras we had received but Chris wrote "revised extra statement" on it (Exhibit 7). This list totaled $30,960. Item 1 on this list for an additional 1,050 sq. ft. concrete for $9,250 was for extra concrete around the pool. I was asked by the workers if the shape they laid out for the concrete was ok and I said yes after making some changes. I thought the larger area would cost more, but Chris did not tell me and no price was discussed. Item 2 is for a waterfall from the pool equipment wall into the pool I had discussed with Chris. We did not have this work done because it was too expensive. Item 3 for one pilaster in the front and three in the back for $2,120 was for one in front and only two in back. I did not ask for this to be done. Chris asked me if he could install these three pilasters, but not as an extra. The two in the back were in the same place the rear patio columns were supposed to have been installed before we reduced the size of the patio cover. I thought there would be an extra cost for these but I didn't know how much and didn't agree to a price. After this work was done Chris came to me with this bill. Item 4 is for a bench behind the jacuzzi for $1,860. I authorized Chris to do this, but thought it was in lieu of installing the wing wall coming off the side of the pool which he did not install. Item 5 for a bench at rear deck was not wanted and not authorized. Chris asked me to do this and I told him I did not want it done. Item 6 is for a different stone than shown on the plan, but we never discussed a price for this and much of the stone delivered was returned because too much was ordered and it was not used. Item 7 is for walls between pilasters in front yard for $1,550. I asked for this but there was no discussion about the price. Item 8 is for stone ribbons in the driveway and enlarging the entrance of the driveway. I never authorized these stone ribbons and repeatedly told Chris I did not want him to cut our driveway to put them in. Enlarging the driveway entrance was always to be done and was part of our original agreement. Chris said he forgot but it shows on the prior plan. If Chris forgot I am ok with paying something, but the $3,450 price is too high and includes the ribbons which we did not want. They used only two pallets of stone and returned the rest. The pallets were only $800 each. Item 9 for molded caps on pilasters was not an extra, except in regard to those for the new pilasters in item 3. I showed Chris the shape of pilaster caps I wanted and told him I wanted them to be formed from concrete. The caps I received are the wrong shape and are pre-cast with some soft fibrous material. Item 10 for pool equipment enclosure wall for $1,650 I am ok with but there was no agreement on the price. Most of the work on the extra list was done four months before I received this list, and there was no discussion of price until after receiving the list. Included in the $28,960 was installing a fountain I purchased in line with the dining room in the rear yard. Chris wrote this on the bottom of the extra list because he knew it was part of the work we wanted done in the original contract (Exhibit 7). This fountain was not installed.

It was agreed that I would select the plants to be installed in our yard. I gave Chris the homeowners association list of plants allowed to be installed (Exhibit 16). Without asking me what plants I wanted Chris installed the lawn, bushes, 3 trees in the front yard, 12 trees and a palm in the back yard. Of the trees installed, three are bottle brush trees which I am allergic to.

5

EXHIBIT "1"

I paid the last invoice I received from Chris on 9-17-2005. After Chris and I discussed this invoice, he agreed to accept $7,992 as payment in full for it; instead of the $11,617 shown on it. The extra list items numbered 6 and 8 both charged for installing the same stone. I may have paid twice for this because I got confused. This payment included the final payment of $3,735 as per contract; but lots of the work had not yet been done and many things had not been corrected. We paid Chris a total of $132,131.77, and he owes us the $1,000 referral credit (Exhibit 7) and $400 for the replacement of dead trees (Exhibit 8). Chris wrote me a note promising to reimburse me $400 for purchasing trees to replace dead ones (Exhibit 8).

The building permit is now expired (Exhibit 9) and one of my neighbors had to pay $1,000 to renew it. I took many pictures of the problems with the work (Exhibit 10). *Note of Enforcement Representative Widmeyer: Photo of Respondent yard sign and yard areas were taken (Exhibit 11).* We wrote many letters to Chris Heisser and here are some of his letters to us also (Exhibit 12). In some of these letters Chris acknowledges that he was to install the water fountain I provide in the back yard (Exhibit 12).

Before I filed the CSLB complaint, Pete Heisser came to see if he could finish the job for us. Pete installed three bushes on the pool equipment wall, plants near front fence and near air conditioner, four more trees, about 20 geraniums in front and some flowers in front of the dining room window. Pete graded the planters, installed some large rocks in the front and rear yard and had a subcontractor cap the benches and pilasters. After completing some of this work which Chris was to have done, Pete came and gave me a bill for $7,000. Pete told me I was to pay $3,000 and said he would get Chris to pay $4,000. I wrote a check for $3,000 and gave it to Pete. I then told my husband what I had done and he told me to stop payment on the check, because we had already paid Chris too much money. I then went to the bank and stopped payment of the check. Pete called me when he found out payment had been stopped. I told Pete he should ask Chris for the $3,000.

I first found out about Kevin Heisser and him being the only person listed on the contractors license with no workers compensation when I called CSLB in May 2006. All my dealings were with Chris.

I will prepare a list of our complaints so you can have an Industry Expert look at the items.


**(b)     CSLB Expert Witness:**

On 2-13-2007, Enforcement Representative Widmeyer requested the industry expert, Mr. Jeff Schulte to inspect the items of complaint, located at: 6958 Hogan St., Moorpark, CA 93021. On 3-15-2007, Enforcement Representative Widmeyer received a report of inspection and estimate from this industry expert, a licensed contractor in good standing with the board. He has been in the construction field for 32 years, and a licensed contractor since . His license number is 566080 with classifications B, C-27 and C-53. His experience and education in construction qualifies him as an expert in industry standards for good and workmanlike construction in the general building, landscaping and swimming pool trades. Estimate of cost to correct is $29,465. He states that he has personally supervised hundreds of projects similar to this project. He has identified 6 of the complaint items that do not meet accepted trade standards for good and workmanlike construction and 10 abandoned items as follows:

Abandoned Items-
1.      Failed to complete installation of two sheer descent water features at west side of pool.
2.      Failed to complete plaster of pool and spa.

6

3.    Failed to supply and install pool and spa equipment.
4.    Failed to supply and install two pool lights.
5.    Failed to grind stone to eliminate sharp edges and protrusions.
6.    Failed to supply install and paint patio shade trellis/timbers.
7.    Failed to pressure wash and seal new concrete areas.
8.    Failed to install lights, supplied by Homeowner, and wiring and controls for pilaster lights.
9.    Failed to remove form boards below cap on front yard wall and complete cultured stone
       veneer in that area.
10.   Failed to supply and install caps on front walkway walls.

Workmanship Items-
1.    Failed to properly install mastic joint between stone pool coping and stone/concrete deck.
2.    Failed to install handhold device, "finger rail of stone", where vertical distance above
       water exceeds 9 inches.
3.    Failed to provide and install adequate irrigation to attain full coverage in lawn and planter
       areas and valve stations overextended with too many sprinkler heads.
4.    Failed to correct splitting seams of precast columns supporting patio cover.
5.    Failed to repair concrete crack, near an inside corner by grass.
6.    Failed to use grout to match existing where steps were repaired in front yard.
                                    (Exhibit 14)
*Note of Enforcement Representative Widmeyer:*
   *Homeowner is aware that the Expert did not address the following two abandoned items -
Respondent failed to supply and install light in spa (ER oversight omitted by accident).
Respondent failed to supply labor only to install water fountain, supplied by Homeowner, in rear
yard (fountain not on site, so installation cost could not be determined at site visit).*
   *Homeowner is aware that the Expert did not address the following workmanship item -
Respondent failed to clean off mortar splashed on garage door and house stucco, and remove
mortar/cement on surface of driveway (verbally added to list at site visit inadvertently left out of
report).*


**(c)    Others:**


**Unpaid Swimming Pool Subcontractor -**
**5-9-2007** Enforcement Representative Widmeyer received a return call from Steven Barrett of
Barrett Pools, Inc.  Mr. Barrett's statements are summarized as follows:
   I was Hamercop Homes, Inc. subcontractor hired to work on the swimming pool being
constructed at the Zhang residence on Hogan St. in Moorpark.  My contract and all dealings with
Hamercop Homes, Inc. were with Chris Heisser who has not paid us in full for the work on that
job.  We did receive partial payment and the check we received was signed by Chris Heisser.
The balance owed to us on the Zhang project is $6,375.92.
   We did two other jobs for Hamercop Homes, Inc. on which we also dealt with Chris Heisser
only.  I will send you a letter with the name and/or address for those projects.  Our CFO is
Stacey Snyder and she will get this information to you.
*Note of Enforcement Representative Widmeyer: Enforcement Representative Widmeyer also
spoke to Ms. Snyder who confirmed the same statements above.*


7


EXHIBIT "1"

**The only four (4) jobs which Kevin Heisser claims he was involved in, as per documents provided by his attorney Mr. Catanese, Esq. as follows:**

**1. Mark Blumhardt -**

**4-16-2007** Enforcement Representative Widmeyer phoned 818-266-8592 and left a message for Mr. Blumhardt who called back. Mr. Blumhardt's statements are summarized as follows:

I heard of Hamercop homes when I was building a friends house. Hamercop Homes, Inc. built my new home which was done between 2002 and 2004. I dealt with both Kevin Heisser and Chris Heisser. Chris was more in charge than Kevin. They came back to fix the garage door a year ago. I dealt with both Kevin and Chris Heisser throughout the job.

**2. Wimi Singh (Gahinder's wife) -**

**5-9-2007** Enforcement Representative Widmeyer phoned 818-515-4672 and spoke with Mrs. Wimi Singh. Mrs. Singh's statements are summarized as follows:

Chris Heisser did a pool, overhang, BBQ, gazebo and waterfall at our prior house. During that prior job Hamercop Homes, Inc. did for us we dealt mainly with Chris Heisser. During this prior contract we dealt with Chris Heisser throughout the project. If his brother or father were here on the job, I don't recall. Chris's brother or father came to our house during construction on our prior house. This prior job took place between the end of 2002 and 2003. Chris' brother Kevin came to our house quite a few times.

We have moved into a new house and again hired Hamercop Homes, Inc. who had already dug our swimming pool and installed the steel when the Building and Safety stopped the work because Hamercop Homes, Inc. had not obtained a permit for this work. Both Chris and Kevin Heisser were involved on our current project. Both Chris and Kevin were present during the negotiations of our current contract with Hamercop Homes, Inc. Both, Chris and Kevin Heisser signed this current contract for the work now underway at our new home. I will ask my husband Gajinder Singh to fax you the entire contract which is many pages.

**3. Steve Chrisman -**

**4-16-2007** Enforcement Representative Widmeyer phoned 818-878-9501 and left message for Mr. Chrisman who called back. Mr. Chrisman's statements are summarized as follows:

I know Chris and Kevin Heisser of Hamercop Homes, Inc. from three years ago when I had an extension built on my house. My neighbor, Jamie Ashton, recommended them. Chris Heisser always took the lead. All contract negotiations were with Chris Heisser who was also the boss on the job. I only found out about Kevin Heisser later in the job. Kevin was not saying anything, if he was there. Kevin Heisser had nothing to do with what was going on. The only time I contacted Kevin was when Chris would not correct the work. The only remedies I ever got were because I contacted Kevin and he would get Chris to make the correction. This project was in 2003 or 2004 and took six months. I spoke to Kevin Heisser about 30 or 40 times toward the end of the job.

**4. Lee Grubin -**

**5-8-2007** Enforcement Representative Widmeyer phoned Lee Grubin at 818-402-9532. Mr. Grubin's statements are summarized as follows:

I found out about Hamercop Homes, Inc. from a referral. I dealt with Kevin Heisser at Discovery Holdings, Inc. for the financing and Hamercop Homes, Inc. for the construction. Both Kevin and Chris Heisser were involved in the contract negotiation. I am having a pool, landscaping, and addition installed, and remodeling done. Kevin is the overseer of the job and was involved at the beginning with the plans, development and financing. Chris Heisser is the on

8

site supervisor and Kevin Heisser would come to the job site once or twice a week. This job began in June 2006 and is almost finished.

**(d)    Other Information:**

Hamercop Homes, Inc. provided a copy of their Form 100, filed with Secretary of State, where statement 4 relating to Schedule F, line 12 it shows Kevin Heisser received no compensation from the corporation in the year of 2005 and the revoked Christopher Heisser received a large amount which was scratched out so it could not be read (Exhibit 13).

On recent license renewal application signed by Kevin Heisser on 4-22-2007 he fails to indicate that his revoked brother Christopher Howard Heisser is an officer of the corporation (Exhibit 1).

## 5. STATEMENT OF RESPONDENT

**2-6-2007** Enforcement Representative Widmeyer met with Kevin Heisser in the Oxnard Contractors State License Board Office. Kevin Heisser's statements are summarized as follows:

I am 36 years old and my older brother Chris Heisser is 45 years old. I worked at CHHQ Company in 1995 and then at Porter Development with my brother as RME's. Then in 2000 I left Porter Development and started developing and financing. In the work I do now; I find investors and people who want to develop projects and arrange the financing. Then we do the project. I will get you some information on the other projects I have done recently.

The Zhang project is not complete because Zhang's will not agree on what needs to be done to finish the work. The Zhang's owe us $8,500 for the completion of work at their house.

Chris Heisser was referred to the Zhang's by Brad Lutz. I knew of the job from that first referral. Chris met with the Zhang's and negotiated the contract. Chris determined the contract price and handled everything. This is not one of our larger jobs and it was well within the size of job Chris can handle without my involving myself in it. The first time I heard of the Zhang's project was when my brother Chris went out to negotiate the contract in May 2006. The first contract negotiations were in December of 2005. I just make sure the job was done. There were problems because Mrs. Zhang would often agree, and then wouldn't agree to what was happening on the job.

I spoke to Mrs. Zhang once on the phone around October or November 2006, after work on the job stopped. I could not understand her because of her thick accent.

My only contact about what was going on was through Chris. Chris ran the job. All decisions on the Zhang job were made by Chris until after work stopped on the project. After that I told Chris not to do any more work on the project unless I knew about it.

My father, Peter Heisser, planted some plants for the landscaping around the Zhang's house under a separate contract with the Zhang's. My father told me he was doing this work but I didn't recommend that he do it. Chris and I were not going to pay for any of my father's work at the Zhang residence. My father did this work on his own.

The swimming pool was not finished because the changes were not agreed upon.

Chris was not listed as a corporate officer on the CSLB records, but is on Secretary of State records. I tried to get our accountant, Bernard Lund, to add Chris onto the CSLB records when I changed the contractor's license from a sole ownership to a corporation. I don't know why Chris

9

was not added onto the CSLB records as a corporate officer. Chris had a contractor's license before this and it was suspended or something. I don't know what the status of Chris' prior contractor license's are.

*Note of Enforcement Representative Widmeyer: Kevin Heisser and Chris Heisser were given a copy of Mrs. Zhang's 1-11-2007 complaint list, and a copy of the contract "Exhibit B" or scope of work on which Chris wrote the type of pool equipment.)*

**Chris Heisser, previously revoked on two licenses. Listed as CFO on Secretary of State, but not listed on CSLB records of Hamercop Homes, Inc. -**
**2-6-2007** Enforcement Representative Widmeyer interviewed Chris Heisser at the Oxnard Contractor's State License Board Office. Chris' brother Kevin Heisser was present during the interview of Chris. Chris Heisser's statements are summarized as follows:

I was referred to the Zhang's by someone, but I don't remember who. I think it was through someone who knew her from the dog collars she makes. I gave Mrs. Zhang some costs for landscaping she planned to have done. The colored plans I gave to Mrs. Zhang were drawn by a man in Victorville.

That is my contract with the Zhang's (Exhibit 4). That is the contract plan and the one with a larger fountain in the back yard was a prior proposed plan (Exhibit 5). Those are the checks I received from the Zhang's (Exhibit 6). Those are my invoices to the Zhang's and my extra list (Exhibit 7). That is a statement I gave Mrs. Zhang agreeing to pay her $400 for trees to replace ones which died (Exhibit 8). That is the permit for the work (Exhibit 9). Those are photos of the Zhang job (Exhibit 9). Those are some of the letters I received from the Zhang's and some of the letters I wrote to them (Exhibit 12).

Mrs. Zhang wanted a bench in the back on the deck beside the pool. She never told me that she did not want this bench. I never understood widening the driveway entrance to be a different issue from cutting and installing stone ribbons in the existing driveway. Mrs. Zhang wanted the ribbons and wider driveway entrance, then she didn't want it. Two waterfalls were always to be installed on the side of the swimming pool and a waterfall from the jacuzzi into the pool. This makes three waterfalls which were included in the original contract. The side deck and wing wall off of the edge of the pool were not installed because it is in the location where Mrs. Zhang was thinking of having a waterfall installed which would have run from the pool equipment wall down into the pool. This waterfall from the pool equipment wall was cancelled because she did not want to spend the money to do it. The plumbing for this waterfall and the three in the pool is already done.

I gave Mrs. Zhang the extra list on the same day it is dated, on 4-20-2005 (Exhibit 13). This was before the invoice showing $10,000 for extras. At that time the concrete had already been poured. All work shown on this list except the waterfall, and maybe number 7, had already been done. This was the first time Mrs. Zhang got a price for the extra work. We had agreed that I would charge the same price per square foot as I charged in the original contract. *(Note of Enforcement Representative Widmeyer: The original contract did not show a price per square foot.)* The number of pilasters on the extra list shows 3 in the rear yard and one in the front yard. This includes two pilasters where the patio cover columns would have been if the patio cover size had not been reduced, two more at the ends of the jacuzzi bench and one in the front yard. That is five pilasters, but I don't know why I put four. I see on my "second revision extra statement", dated 6-22-2005, it shows two in the rear yard and one in the front yard. I guess that the cost for pilasters on the end of the jacuzzi bench were built into the cost of the jacuzzi bench. I told Mrs. Zhang that there would be an extra charge for the additional pilasters and gave

10

her an approximate price.

I don't know why Mrs. Zhang told you the first list of extras she received was the "revised extra statement" dated 6-1-2005; which she said was not given to her until after that date. I have nothing to show that I discussed the extras before that "revised extra statement" dated 6-1-2005. I also have nothing to show that I ever gave prices for the extra work to Mrs. Zhang before that time and the extra work had already been done at the time I gave her the list. I have nothing to show when I gave the "second revision extra statement" list, dated 6-22-2005, to Mrs. Zhang.

Mrs. Zhang never came to me and said she had problems with or disputed the extra list. Mrs. Zhang asked for the bench on the pool deck and wanted ledge stone on the face of it. Mrs. Zhang said that area of the deck looked plain. That is why she wanted that bench installed. The extra charge for the change of material from "Arizona stone" to "three rivers stone" is because it is more expensive. The original agreement was to install "Arizona stone". Mrs. Zhang requested the wall between the pilasters in the front yard, I didn't give her a price for doing this work. I will get you a break down of the price for putting stone ribbons in the existing driveway and the price for enlarging the driveway entrance.

Before the original contract Mrs. Zhang took me and showed me pilaster caps at more than one house that she liked. She did not select which one of the three or so she showed me. She wanted them to be precast concrete, not poured in place. The caps I included in the original contract were poured in place concrete with bull nose edges. Mrs. Zhang found a precast cap manufacturer and I paid them a $750 deposit which I never got back and now they are out of business. The person I bought the precast caps from also did the installation of the caps. The bid from the cap subcontractor included installation of the caps.

The extra for pool equipment enclosure wall is only for the additional linear feet of wall. The wall by the house on the plan where the pool equipment was drawn was not installed. The original contract included moving the pool equipment away from the house to the back yard near the pool. The relocation of the pool equipment was included in the original contract but not the wall around it. This charge is after giving credit for the linear feet of the wall not installed and represents only the additional linear feet of wall around the concrete pad for the equipment.

The final invoice, dated 9-14-2005, shows "balance previous extra $275.00". That is how much Mrs. Zhang still owed on the extra billing. My prior "second revision extra statement" shows the extras cost $24,495 and Mrs. Zhang had already paid us $24,000; so I don't know why the final invoice shows the balance to be $275. The amount $9,617 written on the bottom of the final invoice is how much Mrs. Zhang paid. The final invoice I discussed with Mrs. Zhang and we agreed to a discounted price which she paid in full. I deleted the $275 balance for previous extras. I agreed to charge $1,000, instead of $3,750, for ledge stone. This was for ledge stone facing on all pilasters, and benches. In the original contract I had planned on the pilaster surface being stucco, and the benches were also just going to be stucco on the side. The walls were to be stucco on the sides and top. I never gave Mrs. Zhang a credit for referring me to other people who I got contracts to do work for. I gave Mrs. Zhang a $1,000 credit because she liked to get a discount. This discount was deleted. The pilaster caps extra for $600 was for caps on the pilasters on the end of the jacuzzi bench and I agreed to delete this charge. The seat wall cap charge of $1,000 was for the top of the jacuzzi bench, which was installed by the same subcontractor who installed the pilaster caps. I deleted this charge. The pool waterline tile I planned to use was less expensive than the tile Zhang's selected and I did not charge them for this. The original contract did not specify anything about the waterline tile to be used. I see that Mrs. Zhang paid me $7,992 not $9,617 for this final invoice. I guess that I made a mistake writing that the payment was $9,617. I agreed to accept the $7,992 as full payment for all extras and work shown on this invoice.

11

That correction completion list dated 1-11-2007 is very similar to Mrs. Zhang's prior lists. The two waterfalls on the edge of the pool are part of the original contract and are not complete but the plumbing lines for them are in place. The plastering of the pool has not been done. The pool equipment has not been installed and all plumbing, gas and electrical connections for it are not done. The original contract included two lights in the pool. During the work I had Mrs. Zhang approve only one pool light. I wanted to use just one light to light the water features. The different swimming pool subcontractors were for excavation, steel, gunite, plumbing and electrical, masonry for the coping and tile. This same masonry subcontractor also installed the ledge stone on the benches and pilasters as well. I know Mrs. Zhang is not happy with the pool coping and mastic between it and the deck. Any finger rail required by the building department would be included in the contract.

Regarding landscaping item 1.a. the walls were not supposed to be capped in the original contract only stuccoed with a rounded stucco top. Item 1.b. is where a form board below a wall cap was not removed and cultured stone installed in that area. Item 1.c. installing lights in pilasters were not included in the original contract but I told Mrs. Zhang I would install them for free, if she supplied them. Item 1.d. the water fountain was deleted and not in the original contract to keep the price down. Item 1.e. power washing and sealing the concrete and stone was not done and is part of the work we were to do.

Regarding landscaping item 2.a. Mrs. Zhang did not ask me to replace the pilaster caps. She told me she didn't like their shape but accepted them even though her husband also did not like their shape either. Item 2.b. I am willing to return and replace any trees we installed which have died. Item 2.c. the subcontractor hired to do this does irrigation only and does not install landscaping. The second item 2.c. I agreed to fill in the voids between the curved edges and boards. Item 2.c.I. the columns are precast installed over steel posts by the same contractor that installed the pilaster caps. Item 2.c.III. I don't know what concrete cracks are being referred to here. Item 2.c.IV. I have to grind down the grout and patch in grout which matches the grout in other areas. Item 2.c.V. the fence in the AC area was done by my father, was not paid for and a credit for the linear feet of this wall shown on the plans was given against the linear feet of pool equipment wall.

I don't know why I am not listed as a corporate officer on the CSLB records. I am listed on the Secretary of State records. My prior contractors license is revoked. I did not know that I could not be an officer of this corporation if I had another license which was revoked. I did not know that what I was doing was against the Contractor's License Law. I did not know that I could not have direction and control over the outcome of the work and could only be an employee without the control over the outcome of the work done.

We will get you documents on other jobs we have done; prices of "Arizona stone" vs. "three rivers stone" and the amount used; separate the driveway ribbons from the driveway entrance expansion, and a list of subcontractors showing what they did on the job.

*Note of Enforcement Representative Widmeyer: Respondent's Kevin and Chris failed to provide the items mentioned in this last paragraph except a list of only four people who Kevin had contact with on their jobs over the last several years (Exhibit 15). Chris Heisser faxed part of a Secretary of State Form 100 for the year of 2005 showing Kevin received no compensation from the corporation and the only other officer Chris as having received a large amount which was scratched out on the form (Exhibit 13). Other documents received from Chris Heisser are found in Exhibit 13. Chris Heisser's letters to Zhang's are also found in Exhibit 12.*

12

EXHIBIT "1"

**4-11-2007** Enforcement Representative Widmeyer met with Chris Heisser and their attorney T. Randolph Catanese in the Oxnard CSLB office. Mr. Christopher Heisser's statements are summarized as follows:

I was going to seal all of the concrete, this was included in the contract. It would have cost $200 for materials and $300 for labor, or $500 to seal the new concrete areas. The prior George Sisino/Old Agoura Plumbing judgment against me has not been paid, but I am going to pay it. The prior White judgment against me has not been paid, but I am going to pay it. The Employment Development Department lien has not been paid and even though I told you I would contact them and arrange payment I have not done so. I am afraid to contact EDD about this lien because the amount is very large.

On the Singh project in Calabasas I have received $25,000 so far. We did not get a permit and were caught by the Building and Safety Department when the pool had been dug and steel installed for the pool shell. My brother Kevin has been involved on the job at the first job site meeting. Kevin did a job before this one for the Singh's. We are waiting approval from the Homeowners Association, in process of getting energy calculations and will pay the $2,000 for the permit soon.

Here are the only references which we could find where Kevin was involved on the jobs. There are four references and you may contact them to verify Kevin's involvement.

I don't agree with some things in the Industry Expert Report. The swimming pool was not to have a Jandy remote control system and that part of the cost should be removed from the report. The swimming pool lights which cost $550 are colored lights. I was only going to install standard lights which cost around $150 each. There were two in the contract. One in the spa and one in the pool. Oh I guess that the contract specifies two in the pool, so that would be three lights total. The note I wrote on the extra list stating that I would install the water fountain to be supplied by Zhang's was part of installing the waterfall and when the waterfall was cancelled it also cancelled installing this fountain. I have a copy of the swimming pool plans and will get you a copy of them. Mrs. Zhang did not bring out the lights for us to install them on the pilasters, and the rear pilasters were not to have lights installed on them as I recall.

## 6. NOTICE OF DISPOSITION

On 5-8-2007, Enforcement Representative Widmeyer informed Mrs. Zhang that the investigation was completed and the matter was being recommended for accusation.

On 5-15-2007, Enforcement Representative Widmeyer informed Christopher Heisser and their attorney T. Randolph Catanese, Esq. that the investigation was completed and the matter was being recommended for accusation.

## 7. PERSONNEL AND OTHER ENTITIES

Hamercop Homes, Inc.; license no. 791562; Kevin Matthew Heisser - RMO/CEO/Pres. (only officer on CSLB Records); classification B - General Building; issued 2-21-2001; reissued to corporation 4-17-2001; no workers compensation until 2007, expires (Exhibit 1).
*Note of Enforcement Representative Widmeyer: Secretary of State shows revoked brother Christopher Howard Heisser as CFO of corporation (Exhibit's 2 and 3).*

13

Other Entities: 1. Christopher Howard Heisser is revoked on his former sole ownership license #744376, and his former corporation license #663767 (Exhibit 2).

### 8. HISTORY OF PRIOR ACTION  None.

### 9. SYNOPSIS OF SECTIONS VIOLATED

7083   —   Failed to notify the Registrar, in writing, within 90 days of change of personnel.

7107   —   Abandoned project without legal excuse at a time when the following work remained to be completed:
1.   Failed to complete installation of two sheer descent water features at west side of pool.
2.   Failed to complete plaster of pool and spa.
3.   Failed to supply and install pool and spa equipment.
4.   Failed to supply and install two pool lights.
5.   Failed to grind stone to eliminate sharp edges and protrusions.
6.   Failed to supply install and paint patio shade trellis/timbers.
7.   Failed to pressure wash and seal new concrete areas.
8.   Failed to install lights, supplied by Homeowner, and wiring and controls for pilaster lights.
9.   Failed to remove form boards below cap on front yard wall and complete cultured stone veneer in that area.
10.  Failed to supply and install caps on front walkway walls.
11.  Failed to supply and install light in spa.
12.  Failed to supply labor only to install water fountain, supplied by Homeowner, in rear yard.

7108.5   —   Failed to pay subcontractor for work performed within 10 days of having received payment.

7109(a)   —   Willfully departed in a material respect from accepted trade standards for good and workmanlike construction as follows:
1.   Failed to properly install mastic joint between stone pool coping and stone/concrete deck.
2.   Failed to install handhold device, "finger rail of stone", where vertical distance above water exceeds 9 inches.
3.   Failed to provide and install adequate irrigation to attain full coverage in lawn and planter areas and valve stations overextended with too many sprinkler heads.
4.   Failed to correct splitting seams of precast columns supporting patio cover.
5.   Failed to repair concrete crack, near an inside corner by grass.
6.   Failed to use grout to match existing where steps were repaired in front yard.
7.   Failed to clean off mortar splashed on garage door and house stucco, and remove mortar/cement on surface of driveway.

7112   —   Omitted or misrepresented that the only corporate officer was Kevin Matthew Heisser and failed to include on application for license/renewal the corporate CFO, his revoked older brother Christopher Howard Heisser.

7113   —   Failed in a material respect to complete/correct the project for the price stated in the contract; the owner was/will be required to secure the services of other contractors to complete/correct at a cost of $39,969.92 in excess of the contract

14

EXHIBIT "1"

price.

7114   —   Aided and abetted Christopher Heisser a revoked contractor to continue
contracting after revocation.

7117(b)   —   Operated with personnel not in accordance with the personnel as set forth on the
license.

7121.5   —   Employed, elected or associated with Christopher Heisser a revoked contractor
who directed and controlled the construction operations of respondent
corporation.

7159   —   Failed to comply with Home Improvement contract form subsections as follows:
(d)(8)(C) The contract required a down payment in an amount which is in excess
of the amount allowed by law and received a down payment in an amount which
is in excess of the amount allowed by law.
(d)(9)(C) Received payment in excess of the value of the work performed.

**RELATED SECTIONS:**
Kevin Matthew Heisser subject to sections: 7090, 7090.1, 7097, 7098, 7121.5, 7121, 7122.1 and
7122.5.
Christopher Howard Heisser subject to sections: 7090, 7090.1, 7097, 7098, 7121, 7121.1 and
7122.

## 10. WITNESS LIST

Name:       Ning-Tian Zhang   —       Homeowner
Address:    6958 Hogan St.
            Moorpark, CA 93021
Telephone:  805-529-5539, 805-252-2802, 626-402-2284, fax 805-529-9953
Will testify to: To contract, payment and performance. Will accept subpoena by mail.


Name:       Jeff Schulte   —     Industry Expert
Address:    5150 Collett Ave.
            Encino, CA 91436
Telephone:  818-789-6295, fax 818-789-6255
Will testify to: Industry Expert Report. Will accept subpoena by mail.


Name:       Steven Barrett or Stacey Snyder   —     Unpaid Subcontractor
Address:    Barrett Pools, Inc.
            543 Country Club Dr., Ste. #B-113
            Simi Valley, CA 93065
Telephone:  805-527-5858, fax 805-527-5888
Will testify to: Subcontract, non-payment and only Respondent contact being with the revoked
Chris Heisser. Will accept subpoena by mail.

15

**EXHIBIT "1"**

Name:        Allan Widmeyer      --      CSLB Enforcement Representative
Address:     2220 E. Gonzales Rd., Ste. 102
             Oxnard, CA 93036-8294
Telephone:   805-983-4579, cell 805-338-9356, fax 805-983-3921
Will testify to: To investigation of this complaint. Will accept subpoena by mail.

### 11. EXHIBIT LIST

1.   Computer print-out of Respondent's recent renewal application and license information.
2.   Copy of Revoked Christopher Heisser's prior licenses and legal actions.
3.   Copy of Secretary of State documents showing both Kevin and Chris Heisser.
4.   Copy of Contract, dated 1-8-2005.
5.   Copy of Plans.
6.   Copy of Proof of Payment.
7.   Copy of Invoices and Extra List.
8.   Copy of $400 Credit for replacement trees.
9.   Copy of Building Permit Documents.
10.  Copy of Homeowner's Photos of complaint items.
11.  Copy of ER's photos of Respondent Sign and side and rear yard areas.
12.  Copy of Homeowners Letters to, and from, Respondent and Surety.
13.  Copy of Respondent's Documents: Sect. of State, complaint list's, Sect. of State Form
     100 report of officer compensation, prior bid, plans, contract, permit, extra lists, cap and
     column subcontractor and cert. of insurance.
14.  Copy of Expert Report.
15.  Copy of Respondent's list of 4 jobs Kevin claims to have been involved in over the last 3
     or 4 years.
16.  Copy of Chris' check to replace damaged water meter box, cap deposit, plant plan, HOA
     requirements and plant list, Respondent form.
17.  Copy of Unpaid Subcontractor Documents.

16

# EXHIBIT "1"

**CONTRACTORS STATE LICENSE BOARD**

STATE OF CALIFORNIA

*Northern California:*
Sacramento Intake & Mediation Center
P.O. Box 269116, Sacramento, California 95826-9116
1-800-321-CSLB (2752)

*Southern California:*
Norwalk Intake & Mediation Center   REC'D BY ___ ARW
12501 East Imperial Highway, Suite ___ Norwalk, California 90650
1-800-321-CSLB (2752)

www.cslb.ca.gov

# Complaint Form

6   DEC -6  P1 :36

**NOTICE: INCOMPLETE AND UNSIGNED FORMS WILL BE RETURNED TO YOU.**

**DO NOT SEND ORIGINALS—DOCUMENTS RECEIVED WILL NOT BE COPIED AND/OR RETURNED.**

Please attach COPIES of all pages of contracts (front and back), canceled checks (front and back), invoices, advertisements, business cards, receipts, correspondence, etc.

AUG 3

### PLEASE COMPLETE BOTH SIDES OF THIS FORM

RECEIVED P ·28

1. YOUR NAME   last **ZHANG**   first **NING-TIAN**   middle

ADDRESS   number   street   **6958 HOGAN ST.**

2. CONTRACTOR NAME (as shown on contract/invoice) **HAMERCOP HOMES, INC.**

LICENSE NO., IF ANY **LIC.791562**

city **Moorpark**   county **VENTURA**   state **CA**   ZIP code **93021**

ADDRESS   number **3033**   street **RIKKARD Drive**

PHONE WHERE YOU CAN BE REACHED 8 am-5 pm **(805) 252 2802   626-403-2284**

city **Thousand Oaks,**   state **CA**   ZIP code **91362**

HOME PHONE **805   529 5539**   EMAIL ADDRESS **ntzhang2004@yahoo.com**

PHONE **818 309 3765**   **818-575-9955**   EMAIL ADDRESS **310-479-2652**

Discovery Mtg **818-917-0738**

1b. ☐ I AUTHORIZE THE FOLLOWING PERSON TO HANDLE THE COMPLAINT ON MY BEHALF:

NAME   last   first   middle

WHO PRESENTED THE CONTRACT?

☐ SALESMAN

☒ CONTRACTOR **Chris Heisser**

PHONE 8 a.m.-5 p.m.
(   )

HOME PHONE
(   )

WHERE WAS THE CONTRACT NEGOTIATED? **no**

### PROJECT INFORMATION

3. OWNER OF CONSTRUCTION SITE **6958   Hogan St. Moorpark, CA 93021**
number   street   city   state   ZIP

4. CONSTRUCTION SITE ADDRESS   number **6958**   street **Hogan St.**
city **Moorpark,**   state **CA**   ZIP **93021**

PHONE **805   529 5539**

PHONE **(805)   529 5539**

5. DESCRIBE BRIEFLY THE SCOPE OF THE WORK FOR WHICH YOU CONTRACTED (I.E. PAINTING, PLUMBING, CONCRETE, PATIO COVER, ROOM ADDITION) **Pilasters, Wall & Fay**

**Build a pool & spa, Hardscaping (concrete, stone, patio cover, etc.) & Landscaping for both front & back yard per drawing**

6. CONTRACT DATE **Jan. 8, 2005**   7. AMOUNT OF CONTRACT **$108,735.00**   8. AMOUNT PAID ON CONTRACT **$132,131.77**   9. DATE WORK STARTED **March 15, 2005**   10. DATE WORK CEASED **May 2006**

11. LIST YOUR ITEMS OF COMPLAINT (IF MORE ROOM IS NEEDED, PLEASE ATTACH A SHEET OF PAPER)

**See attached paper**

12. REMEDY SOUGHT: **$60000.-**

FOR OFFICE USE ONLY

| COMPLAINT NUMBER | TYPE CNST | I N V | O R G | PRTY | DATE RECEIVED MO DA YR | SPECIAL PROJCT | DT STAT EXP MO DA YR | CSR INIT | ASSIGNED TO CSR MO DA YR | ER INIT | ASSIGNED TO ER MO DA YR |
|---|---|---|---|---|---|---|---|---|---|---|---|
| N A 0 6 2 1 3 2 | | | | | | | | PLA 0 8 0 X 0 6 | ARW | III Z B OX |

| LICENSE NUMBER | CLOSURE LETTER | DISPOSITION | DATE CLOSED MO DA YR | STATUS CHANGE | STP / |
|---|---|---|---|---|---|
| **791562** | | | | C PN LIA | |
| SECTIONS VIOLATED **7107, 7109, 7115** | c | **490 09 250 c** | **2006 5 07** | DATE   DATE   DATE | STP |

EXHIBIT 1

```
F633                    CONTRACTORS STATE LICENSE BOARD              04/11/2008
                         QUERY INVESTIGATION VIOLATION
                                            Update 03/04/2008  Id C3020MKV
Compln No N A 2006 2132      Investigation Type L
Resp N/S HAMERCOP HOMES INC
Lic No 791562         App No

Cit#              Case# S 2006 544      Arb#              Den#
                        Wrn              Crim
  Violation      IC  Ltr  CM  AG OAH CLB Conv  Violation Description
================================================================================
  B 7083          A                          FAILED TO REPORT LIC CHANGES
  B 7107          A         /0/  5Y           ABANDONED A PROJECT
  B 7108   5      A              5Y           FAILED TO TIMELY PAY SUB
  B 7109   A      A              5Y           DEPARTURE FROM TRADE STANDARDS
  B 7112          A              5Y           MISREP FACTS ON APPLICATION
  B 7113          A              5Y           EXCEEDING CONTRACT AMOUNT
  B 7114          A              5Y           AID AND ABETT NON-LICENSEE
  B 7117   B      A              5Y           LICENSE PERSONNEL VARIATION
  B 7121   5      A              5Y           QUAL PROHIB AGAINST ASSOCIAT
  B 7159   D8C                   5Y           NO 12PT EXCESSIVE DOWNPAYMENT
                                                          MORE ==>
PF1=Quit  PF3=Ex  PF4=Curs Desc  PF5=Bkwd  PF6=Frwd  PF10=Main Menu     EX ___
```

Date: 4/11/2008 Time: 2:34:01 PM

**EXHIBIT "1"**

'age: 1 Document Name: uncitled

```
F633                 CONTRACTORS STATE LICENSE BOARD              04/11/2008
                     QUERY INVESTIGATION VIOLATION
                                      Update 03/04/2008  Id C3020MKV
Compln No N A 2006 2132     Investigation Type L
Resp N/S HAMERCOP HOMES INC
Lic No 791562       App No


Cit#              Case# S 2006 544     Arb#                Den#
                       Wrn               Crim
   Violation       IC Ltr  CM  AG OAH CLB Conv  Violation Description
=====================================================================
 B 7159  D9C      A                             NO PAY SCH:PAY EXCDS VAL OF WK
 B 7115                        6    5Y           FAILURE TO COMPLY W/CONTRA LAW
 B 7159  5A3                   Y    5Y           EXCESSIVE DOWN PAYMENT
 B 7159  5A5                   |    5Y           MONEY EXCDS VAL OF WK




                                                          <== MORE
PF1=Quit  PF3=Ex  PF4=Curs Desc  PF5=Bkwd  PF6=Frwd  PF10=Main Menu    EX ___
```

Date: 4/11/2008 Time: 2:34:08 PM     EXHIBIT "1"





PostngDate:20050224
TransRout:122242681
TranCode:322
ItemViewID:0x3830383062653033
Account:12012006
DIN:11587200
Serial:0
Amount:      349.55
setID:0000000004004041c9700000
rowID:6542



PostngDate:20050224
TransRout:122242681
TranCode:322
ItemViewID:0x3830383062653033
Account:12012006
DIN:11587200
Serial:0
Amount:      349.55
setID:0000000004004041c9700000
rowID:6542



PostngDate:20050224
TransRout:122242681
TranCode:0
ItemViewID:0x3830383062653036
Account:12012006
DIN:11587203
Serial:0
Amount:      349.00
setID:0000000004004041c9700000
rowID:6544



PostngDate:20050224
TransRout:122242681
TranCode:0
ItemViewID:0x3830383062653036
Account:12012006
DIN:11587203
Serial:0
Amount:      349.00
setID:0000000004004041c9700000
rowID:6544

EXHIBIT "2"



# State of California
# Secretary of State



**E-670375**

**FILED**

In the office of the Secretary of
State of the State of California

**Dec - 11 2008**

This Space For Filing Use Only

### STATEMENT OF INFORMATION
(Domestic Stock and Agricultural Cooperative Corporations)

**FEES (Filing and Disclosure): $25.00.** If amendment, see instructions.
**IMPORTANT - READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

| | |
|---|---|
| **CORPORATE NAME** (Please do not alter if name is preprinted.)<br>C2303410<br>HAMERCOP HOMES. INC.<br><br>3033 RIKKARD DRIVE<br>THOUSAND OAKS. CA 91362 | **S** |

**DUE DATE:**

**COMPLETE ADDRESSES FOR THE FOLLOWING** (Do not abbreviate the name of the city. Items 2 and 3 cannot be P.O. Boxes.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 2 STREET ADDRESS OF PRINCIPAL EXECUTIVE OFFICE<br>3033 RIKKARD DRIVE   THOUSAND OAKS. CA  91362 | | | |
| 3 STREET ADDRESS OF PRINCIPAL BUSINESS OFFICE IN CALIFORNIA, IF ANY<br>3033 RIKKARD DRIVE   THOUSAND OAKS. CA  91362 | | | |
| 4 MAILING ADDRESS OF THE CORPORATION, IF DIFFERENT THAN ITEM 2<br>3033 RIKKARD DRIVE   THOUSAND OAKS. CA  91362 | | | |

**NAMES AND COMPLETE ADDRESSES OF THE FOLLOWING OFFICERS** (The corporation must have these three officers.  A comparable title for the specific officer may be added; however, the preprinted titles on this form must not be altered.)

| | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5 CHIEF EXECUTIVE OFFICER/<br>CHRISTOPHER  HOWARD  HEISSER  3033 RIKKARD DRIVE   THOUSAND OAKS. CA 91382 | | | | |
| 6 SECRETARY/<br>CHRISTOPHER  HOWARD  HEISSER  3033 RIKKARD DRIVE   THOUSAND OAKS. CA 91382 | | | | |
| 7 CHIEF FINANCIAL OFFICER/<br>KEVIN  MATHEW  HEISSER  4240 LOST HILLS ROAD   CALABASAS. CA 91302 | | | | |

**NAMES AND COMPLETE ADDRESSES OF ALL DIRECTORS, INCLUDING DIRECTORS WHO ARE ALSO OFFICERS** (The corporation must have at least one director.  Attach additional pages, if necessary.)

| NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 8 CHRISTOPHER HOWARD HEISSER   3033 RIKKARD DRIVE   THOUSAND OAKS. CA 91382 | | | | |
| 9 KEVIN MATHEW HEISSER   4240 LOST HILLS ROAD   CALABASAS. CA 91302 | | | | |
| 10 NAME | ADDRESS | CITY | STATE | ZIP CODE |

| |
|---|
| 11 NUMBER OF VACANCIES ON THE BOARD OF DIRECTIONS. IF ANY: |

**AGENT FOR  SERVICE OF PROCESS** (If the agent is an individual, the agent must reside in California and item 13 must be completed with a California street address (a P.O.Box address is not acceptable).  If the agent is another corporation, the agent must have on file with the California Secretary of State a certificate pursuant to Corporations Code section 1505 and Item 13 must be left blank.)

| | CITY | STATE | ZIP CODE |
|---|---|---|---|
| 12 NAME OF AGENT FOR SERVICE OF PROCESS<br>BERNARD J LUND | | | |
| 13 STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL<br>2029 VENTURA BLVD   WOODLAND HILLS. CA 91364 | | | |

**TYPE OF BUSINESS**

| |
|---|
| 14 DESCRIBE THE TYPE OF BUSINESS OF THE CORPORATION<br>GENERAL CONTRACTOR |

| |
|---|
| 15 BY SUBMITTING THIS STATEMENT OF INFORMATION TO THE CALIFORNIA SECRETARY OF STATE, THE CORPORATION CERTIFIES THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT |

| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |
|---|---|---|---|
| 12/11/2008 | CHRISTOPHER HOWARD HEISSER | PRESIDENT/CEO | |

SI-200 C (REV 01/2008)

APPROVED BY SECRETARY OF STATE

**EXHIBIT "3"**

AUG-10-2001 FRI 10:10 AM                          FAX NO. 80~~758524          P. 02

## CONTRACTOR AGREEMENT

THIS AGREEMENT is entered into on April 23, 2005, ("Effective Date"), by and between Hamercop Homes, Inc., a California corporation ("Contractor") and Mr. and Mrs. Tan ("Owner").

NOW THEREFORE, for good and valuable consideration, the sufficiency of which is hereby acknowledged, the parties intending to be legally bound, agree as follows:

### ARTICLE 1.  SCOPE OF WORK

Contractor shall provide all of the materials and perform all of the work shown on the architectural plan Dated 3/25/05 ("Architectural Plan") provided by Owners attached hereto as Exhibit "A" as well as the structural plan by Miles Engineering, Inc. All work is to be performed on the property located at 11243 Watson Drive, Moorpark CA.. In the event of a conflict between the Architectural Plan and the Architectural Plan Details, the Structural Plan Specifications shall control. A scope of work is attached hereto as exhibit "B". In the event there becomes a conflict between the Architectural plans and the Scope Of Work, The Scope Of Work shall control.

### ARTICLE 2.  TIME OF COMPLETION

The work to be performed under this Agreement shall be commenced on or before May 10, 2005 ("Commencement Date"), and shall be completed on or before August 30, 2005 ("Completion Date"), subject to permits being issued by May 01, 2005. Permits will obtained by contractor and paid for by owner. After having obtained permits the contractor will obtain all required inspections necessary for a final sign-off. All consultants retained to complete plan to be paid for by owner. Time is of the essence. The following constitutes substantial commencement of work pursuant to this Agreement:  Begin pool excavation.

### ARTICLE 3.  PRICE

Owner shall pay Contractor for the material and labor to be performed under this Agreement the sum of One Hundred ~~Eight~~ Thousand ~~Five Hundred Seventy Hundred~~ Dollars and 00/100 ($120,000.00), subject to additions and ~~deductions~~ pursuant to authorized change orders.

### ARTICLE 4.  PROGRESS PAYMENTS

1. Owner shall make payments to Contractor pursuant to the payment schedule set forth in Exhibit "C" attached hereto ("Payment Schedule"). A deposit of $5,000.00 will be issued by owners at execution of contract.

2. In no event shall the Payment Schedule provide for Contractor to receive, nor shall Contractor actually receive, payment in excess of 100% of the value of the work performed on the project at any time, excluding finance charges.

### ARTICLE 5.  GENERAL PROVISIONS

1. All work shall be completed in a workman-like manner and in compliance with all building codes and other applicable laws. Owner also understands there has been no soil research performed by a licensed geologist and therefore interaction or direction from a soils specialist may change the scope of work as it is described in the plans. If a change becomes necessary as directed by one or more of the retained consultants, the agreed upon price of the job may be affected as well. It is understood that contractor is performing the work under the direction of the the engineered plan provided by Miles Engineering Inc.

2. To the extent required by law all work shall be performed by individuals duly licensed and authorized by law to perform said work.

Initials _____   _____                        - 1 -                        Contractor Agreement - Alikian

EXHIBIT 1

EXHIBIT "4"

AUG-10-2001 FRI 10:10 AM          FAX NO. 80&&758524          P. 03

3. Contractor may at its discretion engage subcontractors to perform work hereunder, provided Contractor shall fully pay said subcontractor and in all instances remain responsible for the proper completion of this Agreement.

4. Contractor shall furnish Owner appropriate releases or waivers of lien for all work performed or materials provided at the time the next periodic payment shall be due.

5. All change orders shall be in writing and signed both by Owner and Contractor and shall be incorporated in and become part of the contract.

6. Contractor warrants it is adequately insured for injury to its employees and others, including subcontractors, incurring loss or injury as a result of the acts of Contractor or its employees.

7. Contractor shall obtain (Owner shall pay for) all required permits necessary for the work to be performed.

8. Contractor agrees to remove all debris and leave the premises in broom clean condition.

9. In the event Owner shall fail to make payment due hereunder, Contractor may cease work without breach pending payment or resolution of any dispute.

11. All disputes hereunder shall be resolved by binding arbitration in accordance with rules of the American Arbitration Association.

12. Contractor shall not be liable for any delay due to circumstances beyond its control including strikes, casualty or general unavailability of materials.

13. Contractor warrants all work and material to be free of any defects for a period of twelve months following completion. Contractor shall provide Owner any and all written warranties supplied by manufacturers of material installed pursuant to this Agreement.

14. This Agreement supersedes all written or oral agreements, if any, between the parties, and this Agreement constitutes the entire and only agreement between the parties.

15. FAILURE BY CONTRACTOR WITHOUT LAWFUL EXCUSE TO SUBSTANTIALLY COMMENCE WORK WITHIN TWENTY (20) DAYS FROM THE APPROXIMATE DATE SPECIFIED IN THE PROPOSAL AND CONTRACT WHEN WORK WILL BEGIN IS A VIOLATION OF THE CONTRACTOR'S LICENSE LAW.

16. THE LAW REQUIRES THAT BEFORE A LICENSED CONTRACTOR CAN ENTER INTO A CONTRACT WITH YOU FOR A WORK OF IMPROVEMENT ON YOUR PROPERTY, HE MUST GIVE YOU A COPY OF THE FOLLOWING NOTICE (Section 7018.5-Contractor's License Law):

Under the California Mechanics Lien Law, any Contractor, subcontractor, laborer, supplier, or other person or entity who helps to improve your property, but is not paid for his or her work or supplies, has a right to place a lien on your home, land, or property where the work was performed and to sue you in court to obtain payment.

This means that after a court hearing, your home, land, and property could be sold by a court officer and the proceeds of the sale used to satisfy what you owe. This can happen even if you have paid your Contractor in full if the contractor's subcontractors, laborers, or suppliers remain unpaid.

To preserve their rights to file a claim or lien against your property, certain claimants such as subcontractors or material suppliers are each required to provide you with a document called a "Preliminary Notice". Contractors and laborers who contract with owners directly do not

Initials _____  _____          - 2 -          Contractor Agreement - Allkian

EXHIBIT 1

EXHIBIT "4"

AUG-10-2001 FRI 10:10 AM      ·⸱·              FAX NO. 80⸱⸱758524              P. 04

have to provide such notice since you are aware of their existence as an owner. A preliminary notice is not a lien against your property. Its purpose is to notify you of persons or entities that may have a right to file a lien against your property if they are not paid. In order to perfect their lien rights, a contractor, subcontractor, supplier, or laborer must file a mechanics lien with the county recorder, which then becomes a recorded lien against your property. Generally, the maximum time allowed for filing a mechanics lien against your property is 90 days after substantial completion of your project.

Contractors are required by law to be licensed by the Contractors' State License Board. Any questions concerning a contractor may be referred to the Registrar of the Board, Contractors' State License Board, P.O. Box 26000, Sacramento California 95826.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

Hamercoop Homes, Inc. "Contractor"                    "Owner"

By: _____            _____
Chris Heisler, President                              Mr. and Mrs. Tan
4240 Lost Hills Road, Suite 2902                     11243 Watson Dr.
Calabasas, CA 91301                                  Moorpark CA.
(818) 309-3765 Mobile
(805) 241-7160 Office
(805) 241-6554 Facsimile
California License Number - 791562

Initials _____                        - 3 -                   Contractor Agreement - Alikian

EXHIBIT 1

EXHIBIT "4"

AUG-10-2001 FRI 10:10 AM          ⌐⌐          FAX NO. 805₂758524          P. 05

**EXHIBIT "A"**

**Architectural Plan -- Revision 02-04-03**

See Attached.

Initials _____ _____        A-1        Contractor Agreement - Alikian

EXHIBIT 1

**EXHIBIT "4"**

AUG-10-2001 FRI 10:10 AM                    FAX NO. 805 2758524                    P. 06

# Hamercop Homes, Inc.

4-22-05

## EXHIBIT "B"
## SCOPE OF WORK

1- All concrete work shown on plan to be stamped, colored and sealed. Concrete to be 4" thick with # 4 rebar 24" o/c. A 1.5" sand base will be provided.

2- Pilasters: construct (7) pilasters @ front yard as shown on plan. Pilasters to be stucco with brick cap as shown on plan. Sizing to be 30"x30"x36"

3- Bench/pilasters: Provide bench and pilaster system behind pool as shown on plan. Bench to be constructed out of block with a stucco face and brick cap 18" wide and 20" tall. Pilaster to also be constructed of block with a stucco face and brick cap. Pilasters to be 36"x36"x36".

4- Brick ribbons: Provide single brick ribbons @ driveway and entry walk way as shown on plan. Brick to be selected by owner.

5- Drainage: Provide 3" drain lines as necessary throughout yard. Contour yard grade to allow for proper drainage to catch basins. Provide brass drain covers at all concrete areas.

6- B.B.Q.: Construct B.B.Q out of block with a stucco face. Supply and install tile countertop. Provide gas run for owner purchased B.B.Q unit. Measurements: 3'x9'

7- Walls: Provide trash enclosure wall as shown on plan. Wall to be built of block and stucco over. Wall cap to be provided as well with stucco finish.

8- Trellis: Provide trellis cover @ rear of house. Cover to be attached to house and built of paint grade lumber. Corbel cut tails of overhang. Provide pre-cast columns and steel posts. Owner to select column profile.

9- Fine grade: Provide fine grading as necessary for elevation changes as shown on plan and drainage contouring.

10- Pool and spa: Pool to be 16'x36', spa to be 6'x9'. To include: Excavation, steel installation, plumbing and electrical, plaster and tile @ waterline and spillways. Provide water feature as shown on plan on both sides of Jacuzzi spill way. Pool to include (2) lights and spa (1) light. Equipment to include: (2) Jandy ½ h.p. pumps, (1) Filtration pump 1.5 h.p. by jandy, a 400,000 B.T.U. heater by jandy, (1) 60 s.f. filter by jandy, (7) spa jets

11- Garbage: All debris and garbage generated by contractor to be hauled away by contractor.

12- Pool coping to be stone. Type of stone to be selected by owner.

Real Estate Development  Construction Management  General Construction
3033 Rikkard Drive  Thousand Oaks, CA 91362
phone.818.400.6387
fax.805.241.4094
License number 791562

EXHIBIT 1

EXHIBIT "4"

AUG-10-2001 FRI 10:10 AM                    FAX NO. 8053758524                    P. 07

# Hamercop Homes, Inc.

### EXHIBIT "C"
### PAYMENT SCHEDULE

1- Payment # 1 due when Pool excavated $10,000.00
2- Payment # 2 due when steel, plumbing and electrical complete in pool.
   $10,000.00
3- Due when gunite installed $15,000.00
4- Due when drainage installed $10,000.00
5- Due when fine grade complete $10,000.00
6- Due when pilasters built and walls built $15,000.00
7- Due when forming complete $20,000.00
8- Due when concrete poured $20,000.00
9- Due when trellis built and pool equip installed $5,000.00
10- Due when plaster installed in pool and job complete $5,000.00

**Real Estate Development  Construction Management  General Construction**
**3033 Rikkard Drive  Thousand Oaks, CA 91362**
**phone.818.400.6387**
**fax.805.241.4094**
**License number 791562**

EXHIBIT 1

## EXHIBIT "4"

AUG-10-2001 FRI 10:10 AM         FAX NO. 8052758524                    P. 08

# Hamercop Homes, Inc.

4-18-05

Mr and Mrs. Tan
11243 Watson Drive
Moorpark CA.

### YARD BUDGET:

1- CONCRETE:  Stamped, colored, sealed    $42,000.00
2- POOL AND SPA:  As shown on plan   $44,500.00
3- B.B.Q.:  N.I.C. unit, stucco body, tile counter top  $4,800.00
4- PILASTERS AND BENCHES: As shown on plan @ front yard only
$5,750.00
5- TRASH ENCLOSURE WALL:  $1,800.00
6- BRICK STEPS AND RIBBONS: $3,450.00
7- BENCH AND PILASTERS @ REAR OF POOL: As shown on plan.
$3,000.00
9- TRELLIS COVER AT HOUSE: $8,990.00   (Allowance no detail)
10- DRAINAGE:  $4,250.00

   Total   $120,000.00

**Real Estate Development  Construction Management  General Construction**
**3033 Rikkard Drive  Thousand Oaks, CA 91362**
**phone.818.400.6387**
**fax.805.241.4094**
**License number 791562**

EXHIBIT 1

## EXHIBIT "4"

## TOLLING AGREEMENT

This Tolling Agreement ("Agreement"), is made as of this First day of April, 2008, by and between Jin L. Wang and Hong L. Tan ("Wang and Tan") on the one hand, and Kevin Heisser ("Kevin"), Christopher Heisser ("Christopher"), and Hamercop Homes, Inc. ("Hamercop")(hereinafter Kevin, Christopher and Hamercop are sometimes collectively referred to as "the Hamercop Parties"), on the other hand. Wang and Tan and/or the Hamercop Parties are sometimes referred to singularly as a "Party" and/or collectively as "the Parties". This Agreement is made and executed with reference to the following:

### Recitals

WHEREAS, Wang and Tan contend that the Hamercop Parties provided certain work, labor, materials and services to Wang and Tan pursuant to the terms of a written Construction Agreement ("the Agreement") in connection with the construction of a work of improvement located at the street address commonly known as 11243 Watson Drive, Moorpark, CA ("the Property"). Wang and Tan allege various contract and tort claims against the Hamercop Parties in relation to the Agreement;

WHEREAS, on or about October 29, 2007, Wang and Tan filed a Demand for Arbitration with the American Arbitration Association ("AAA") alleging claims against Kevin, Christopher, and Hamercop, for Breach of Contract, Intentional and Negligent Misrepresentation, Alter Ego, Disgorgement of Sums Paid to an Unlicensed Contractor, and Negligence ("the AAA Action");

WHEREAS, one or more of the Hamercop Parties have filed a general denial in the AAA Action;

WHEREAS, a dispute has arisen as to whether or not all of the Hamercop Parties are participating in the AAA Action and whether or not each of them have agreed to be bound by the ruling of the Arbitrator in the AAA Action.

WHEREAS, the Parties hereto acknowledge that the costs of pursuing and defending the various claims which could be made in this matter will be costly and that they now seek to attempt to resolve this dispute informally before Wang and Tan proceed with filing of a Ventura Superior Court Action.

WHEREAS, Wang and Tan are willing to dismiss the AAA Action, without prejudice, and delay the filing of their Ventura Superior Court Action by sixty (60) days on the terms and conditions set forth herein

NOW, THEREFORE, in consideration of the foregoing facts and circumstances, Allen and General agree, as follows:

1

## EXHIBIT "5"

## Agreement

1.  **Tolling of the Statute of Limitations**:  In consideration for Wang and Tan's dismissal of the AAA Action, without prejudice, and for delaying the filing of an action in the Ventura County Superior Court by at least sixty (60) days, Kevin, Christopher and Hamercop each hereby expressly agree to toll, suspend and waive each of their rights arising from any and all applicable statute of limitations, including, but not limited to, the time limitations specified in California Civil Code §3144(a) and in California Civil Code §3172, while the parties explore settlement discussions.

The Parties agree that the running of all periods of limitations, repose, or laches applicable to any claims, causes of action or remedies, and/or statutory penalties (including but not limited to any and all disgorgement statutes), are hereby tolled for the period beginning April 1, 2005, to and including December 1, 2008 ("Tolling Period"), such that the Tolling Period shall not be considered in determining whether the claims, causes of action or remedies, or any portion thereof are time barred for any action brought by Wang and Tan as against one or more of the Hamercop Parties.

It is also agreed that any claims that may exist by and between the Hamercop Parties shall also be tolled for the Tolling Period.  However, nothing contained herein shall prevent Wang and Tan from reinitiating the AAA Action or proceeding in Superior Court at any time after the sixty (60) day period specified above.

2.  **Contractor's Bond**:  The Hamercop Parties further consent that the Tolling Period shall also apply to any claim(s) made against the Hamercop Parties' contractor bond(s).

3.  **No Admission**:  The execution of this Agreement shall not be deemed an admission of any liability or wrongdoing by any Party.  Each Party has consistently maintained that they are not liable or responsible to the other Party based upon the claims and contentions set forth in the Recitals.

4.  **Non Admissibility**:  This Agreement shall not be offered or received in evidence, nor shall it be admissible or used in any trial or other proceeding, except for purposes of enforcement hereof and/or to defeat a claim that certain claims are barred by the statute of limitations.

5.  **Power to Execute**:  All persons signing the Agreement represent and warrant that they have complete authority, right and power to enter into and execute this Agreement, on behalf of the entity for which they sign.

6.  **Partial Invalidity**:  In the event that any of the terms, covenants or conditions contained in this Agreement is held to be invalid, then any such invalidity shall not affect any other term, covenant or condition contained herein which shall remain

2

EXHIBIT "5"

in full force and effect, unless such term, covenant or condition is material to the intent of this Agreement.

7.    **Binding Effect**: This Agreement shall be binding upon and inure to the benefit of the respective Parties, their successors, assigns, administrators, trustees in bankruptcy, officers, directors, agents, representatives, and employees.

8.    **Jurisdiction and Venue**: This Agreement shall be governed by the laws of the State of California and is entered into and made to be performed and shall be enforced for all purposes in Ventura County. The venue for any such proceeding shall be in Ventura County, State of California.

9.    **Waiver**: No provision hereof may be waived unless in writing and signed by the Party against which the waiver is to be enforced. Waiver of any one provision herein shall not be deemed to be a waiver of any other provisions herein, and a waiver for one purpose or instance shall not be deemed a continuing or ongoing waiver for all purposes or instances. This Agreement may be modified or amended only by written Agreement executed by all of the Parties.

10.    **Counterparts**: This Agreement may be executed in counterparts with each counterpart being deemed one and the same original document. The Parties may execute and transmit this executed Agreement by facsimile. This executed Agreement, so transmitted, shall have the same force and effect as the delivery of the original agreement, duly executed in ink, by the Party to be charged.

11.    **Paragraph Headings**: Paragraph headings are for the convenience of the Parties only and shall not be considered in construing or interpreting this Agreement.

12.    **Further Assurances**: Each of the Parties agrees to execute such other and further agreements and writings as may be necessary to effectuate the intent of this Agreement.

13.    **Merger and Integration**: With the express understanding that this Agreement incorporates the Subcontract, this Agreement expressly supersedes all prior agreements and negotiations between the Parties on the subject matter hereof and is intended to be the sole and only agreement by and between the Parties with respect to the subject matter herein set forth. There are no representations or warranties made by any Party to induce any other Party to execute this Agreement not set forth herein.

It is so agreed:

[Signatures follow on the next page]

**EXHIBIT "5"**

04/07/2008  18:12    81878454    LAW OFFICES                    PAGE  02/02
APR-07-2008 11:55 From:                        To  3 784 5406    P.5/5
Apr 07 08 02:39p    Hamercop Homes        8052416554        P.6

| December ___, 2006 | HAMERCOP HOMES, INC. |
| | By: |
| | Its: _____ |
| December ___, 2006 | |
| | Kevin Heisser |
| December ___, 2006 | |
| | Christopher Heisser |
| December ___, 2006 | |
| | Jin L. Wang |
| December ___, 2006 | |
| | Hong L. Tan |

4

EXHIBIT "5"

| December __, 2006 | HAMERCOP HOMES, INC. |
| | By: _____ |
| |    Its: _____ |
| December __, 2006 | |
| | _____ |
| | Kevin Heisser |
| December __, 2006 | |
| | _____ |
| | Christopher Heisser |
| December __, 2006<br>AfrIL 15, 2008 | |
| | Jin L. Wang |
| December __, 2006<br>APRIL 15, 2008 | |
| | Hong L. Tan |

4

EXHIBIT "5"

## TOLLING AGREEMENT

This Tolling Agreement ("Agreement"), is made as of this First day of April, 2008, by and between Jin L. Wang and Hong L. Tan ("Wang and Tan") on the one hand, and Kevin Heisser ("Kevin"), Christopher Heisser ("Christopher"), and Hamercop Homes, Inc. ("Hamercop")(hereinafter Kevin, Christopher and Hamercop are sometimes collectively referred to as "the Hamercop Parties"), on the other hand. Wang and Tan and/or the Hamercop Parties are sometimes referred to singularly as a "Party" and/or collectively as "the Parties". This Agreement is made and executed with reference to the following:

### Recitals

WHEREAS, Wang and Tan contend that the Hamercop Parties provided certain work, labor, materials and services to Wang and Tan pursuant to the terms of a written Construction Agreement ("the Agreement") in connection with the construction of a work of improvement located at the street address commonly known as 11243 Watson Drive, Moorpark, CA ("the Property"). Wang and Tan allege various contract and tort claims against the Hamercop Parties in relation to the Agreement;

WHEREAS, on or about October 29, 2007, Wang and Tan filed a Demand for Arbitration with the American Arbitration Association ("AAA") alleging claims against Kevin, Christopher, and Hamercop, for Breach of Contract, Intentional and Negligent Misrepresentation, Alter Ego, Disgorgement of Sums Paid to an Unlicensed Contractor, and Negligence ("the AAA Action");

WHEREAS, one or more of the Hamercop Parties have filed a general denial in the AAA Action;

WHEREAS, a dispute has arisen as to whether or not all of the Hamercop Parties are participating in the AAA Action and whether or not each of them have agreed to be bound by the ruling of the Arbitrator in the AAA Action.

WHEREAS, the Parties hereto acknowledge that the costs of pursuing and defending the various claims which could be made in this matter will be costly and that they now seek to attempt to resolve this dispute informally before Wang and Tan proceed with filing of a Ventura Superior Court Action.

WHEREAS, Wang and Tan are willing to dismiss the AAA Action, without prejudice, and delay the filing of their Ventura Superior Court Action by sixty (60) days on the terms and conditions set forth herein

NOW, THEREFORE, in consideration of the foregoing facts and circumstances, Allen and General agree, as follows:

1

## EXHIBIT "6"

## Agreement

1. **Tolling of the Statute of Limitations**: In consideration for Wang and Tan's delaying of the AAA Action and the delay in filing of an action in the Ventura County Superior Court until after mediation, Kevin, Christopher and Hamercop each hereby expressly agree to toll, suspend and waive each of their rights arising from any and all applicable statute of limitations, including, but not limited to, the time limitations specified in California Civil Code §3144(a) and in California Civil Code §3172, while the parties explore settlement discussions.

   The Parties agree that the running of all periods of limitations, repose, or laches applicable to any claims, causes of action or remedies, and/or statutory penalties (including but not limited to any and all disgorgement statutes), are hereby tolled from April 1, 2005, to and including May 1, 2009 ("Tolling Period"), such that the Tolling Period shall not be considered in determining whether the claims, causes of action or remedies, or any portion thereof are time barred for any action brought by Wang and Tan as against one or more of the Hamercop Parties.

   It is also agreed that any claims that may exist by and between the Hamercop Parties shall also be tolled for the Tolling Period. However, nothing contained herein shall prevent Wang and Tan from reinitiating the AAA Action or proceeding in Superior Court at any time after the sixty (60) day period specified above.

2. **Contractor's Bond**: The Hamercop Parties further consent that the Tolling Period shall also apply to any claim(s) made against the Hamercop Parties' contractor bond(s).

3. **No Admission**: The execution of this Agreement shall not be deemed an admission of any liability or wrongdoing by any Party. Each Party has consistently maintained that they are not liable or responsible to the other Party based upon the claims and contentions set forth in the Recitals.

4. **Non Admissibility**: This Agreement shall not be offered or received in evidence, nor shall it be admissible or used in any trial or other proceeding, except for purposes of enforcement hereof and/or to defeat a claim that certain claims are barred by the statute of limitations.

5. **Power to Execute**: All persons signing the Agreement represent and warrant that they have complete authority, right and power to enter into and execute this Agreement, on behalf of the entity for which they sign.

6. **Partial Invalidity**: In the event that any of the terms, covenants or conditions contained in this Agreement is held to be invalid, then any such invalidity shall not affect any other term, covenant or condition contained herein which shall remain

2

**EXHIBIT "6"**

in full force and effect, unless such term, covenant or condition is material to the intent of this Agreement.

7.    **Binding Effect**: This Agreement shall be binding upon and inure to the benefit of the respective Parties, their successors, assigns, administrators, trustees in bankruptcy, officers, directors, agents, representatives, and employees.

8.    **Jurisdiction and Venue**: This Agreement shall be governed by the laws of the State of California and is entered into and made to be performed and shall be enforced for all purposes in Ventura County.  The venue for any such proceeding shall be in Ventura County, State of California.

9.    **Waiver**: No provision hereof may be waived unless in writing and signed by the Party against which the waiver is to be enforced.  Waiver of any one provision herein shall not be deemed to be a waiver of any other provisions herein, and a waiver for one purpose or instance shall not be deemed a continuing or ongoing waiver for all purposes or instances.  This Agreement may be modified or amended only by written Agreement executed by all of the Parties.

10.    **Counterparts**: This Agreement may be executed in counterparts with each counterpart being deemed one and the same original document. The Parties may execute and transmit this executed Agreement by facsimile.  This executed Agreement, so transmitted, shall have the same force and effect as the delivery of the original agreement, duly executed in ink, by the Party to be charged.

11.    **Paragraph Headings**: Paragraph headings are for the convenience of the Parties only and shall not be considered in construing or interpreting this Agreement.

12.    **Further Assurances**: Each of the Parties agrees to execute such other and further agreements and writings as may be necessary to effectuate the intent of this Agreement.

13.    **Merger and Integration**: With the express understanding that this Agreement incorporates the Subcontract, this Agreement expressly supersedes all prior agreements and negotiations between the Parties on the subject matter hereof and is intended to be the sole and only agreement by and between the Parties with respect to the subject matter herein set forth.  There are no representations or warranties made by any Party to induce any other Party to execute this Agreement not set forth herein.

It is so agreed:

[Signatures follow on the next page]

3

**EXHIBIT "6"**

| December ___, 2006 | HAMERCOP HOMES, INC. |
| | |
| *1-28-05* | By: _____ |
| | Its: _____ |
| December ___, 2006 | |
| | |
| *1-28-05* | _____ |
| | Kevin Heisser |
| December ___, 2006 | |
| | |
| *1-28-05* | _____ |
| | Christopher Heisser |
| December ___, 2006 | |
| | |
| | _____ |
| | Jin L. Wang |
| December ___, 2006 | |
| | |
| | _____ |
| | Hong L. Tan |

4

EXHIBIT "6"

| | |
|---|---|
| December __, 2006 | HAMERCOP HOMES, INC.<br><br>By: _____<br>    Its: _____ |
| December __, 2006 | _____<br>Kevin Heisser |
| December __, 2006 | _____<br>Christopher Heisser |
| December __, 2006<br>JAN 28, 2009 | _____<br>Jin L. Wang |
| December __, 2006<br>JAN 28, 2009 | _____<br>Hong L. Tan |

4

# EXHIBIT "6"

| In re:<br>Kevin M. Heisser and Lisa M. Heisser<br><br>Debtor(s). | CHAPTER 7<br><br>CASE NUMBER 1:09-bk-25448-KT |
| --- | --- |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 21700 Oxnard Street, Suite 1290, Woodland Hills, CA 91367

A true and correct copy of the foregoing document described First Amended Complaint To Determine Dischargeability Of Debt Pursuant To 11 U.S.C. Section 523©(1); Section 523(a)(2)(A) And 523(a)(4) will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On June 15, 2010 I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

Baruch C. Cohen, Esq.        bcc4929@aol.com
Amy Goldman, Trustee        goldman@lbbslaw.com
A. Scott Brown, Esq.         asblaw@pacbell.net
United States Trustee        ustpregion16.wh.ecf@usdoj.gov

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On _____ I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on June 15, 2010_____ I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Honorable Kathleen Thompson
U.S. Bankruptcy Court
21041 Burbank Blvd.
Woodland Hills, CA 91367

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 06/15/10 | Jessica Dugan | _Dugan_ |
| --- | --- | --- |
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.